DAMIAN WILLIAMS
United States Attorney
Southern District of New York
By:     JENNIFER JUDE
        DAVID E. FARBER
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2800
jennifer.jude@usdoj.gov
david.farber@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

                Plaintiff,

          -v-

VANCE FINANCE AND HOLDING CORP.;
ANTOINETTE GUERRINI-MARALDI, individually and
in her capacity as trustee; MELISSA P. ROESSLER,
individually and in her capacity as trustee, and as co-
executor of the estate of Carolyn Lucioli-Ottieri;
GUSTAVO ROESSLER, individually and in his capacity
as trustee; DANIEL S. PHELAN, individually and in his
capacity as trustee; LASZLO ADAM, in his capacity as
trustee; JOHN V. PHELAN, individually and in his
capacity as trustee; KIMBERLEE PHELAN, in her
capacity as trustee; MICHAEL C. PHELAN, individually
and in his capacity as trustee; TANYA L. PHELAN, in
her capacity as trustee; PIERO LUCIOLI-OTTIERI,
individually and in his capacity as trustee, and as co-
executor of the estate of Carolyn Lucioli-Ottieri;
ISABELLA SANTANGELO; ALESSANDRA
LUCIOLI-OTTIERI; ALESSANDRO GUERRINI-
MARALDI, individually and in his capacity as trustee;
FILIPPO GUERRINI-MARALDI; VANESSA WILCOX;
HANCOCK WHITNEY CORPORATION, as trustee; J.P.
MORGAN TRUST COMPANY OF DELAWARE, as
trustee; and JOHN DOES 1-10,

                Defendants.

---

**COMPLAINT**

24 Civ. 6846

**JURY TRIAL DEMANDED**

Plaintiff the United States of America (the "United States"), by its attorney, Damian Williams, United States Attorney for the Southern District of New York, alleges as follows:

## INTRODUCTION

1.      In 2002, the seventeen shareholders of Vance Finance and Holding Corporation ("Vance"), members of an extended family who held shares individually and through several trusts, implemented a plan to sell Vance's stock and keep the proceeds while avoiding paying the tens of millions of dollars of tax liabilities owed as a result of the sale. They engaged in an intermediary transaction tax shelter (the "Intermediary Transaction"), in which they purportedly sold their Vance stock to an intermediary entity (the "Stock Sale") formed a few days earlier under the direction of tax-shelter promoter James Haber of the Diversified Group Inc., at a price that exceeded the fair market value of the stock when taking into account the tax liabilities from the built-in capital gain from the Vance assets. At the time of the Stock Sale, Vance's primary assets were $9.1 million in cash and a portfolio of marketable securities with a fair market value of approximately $59 million and a tax basis of $15.3 million. When Vance sold the portfolio of marketable securities, it realized a taxable gain of $43.7 million. However, as part of the Intermediary Transaction, Vance also generated a fake capital loss through an abusive tax shelter known as a "Son-of-BOSS" transaction to purportedly offset the taxable gain from the sale of the marketable securities. As a result, the tax on the gain from the asset sale was not paid.

2.      By the time the Internal Revenue Service ("IRS") audited Vance and disallowed the fake loss, the taxes owed could not be collected from Vance because its assets had been transferred to its former shareholders leaving it (by design) with little to nothing of value. Through the Intermediary Transaction scheme the defendants improperly avoided paying more than $16.9

million in federal income taxes. With the addition of statutory interest and penalties, their tax liability now amounts to more than $80.9 million.[1]

3.    This suit seeks to recover those funds by seeking two forms of relief. First, the suit seeks a judgment against Vance awarding the United States the amount of Vance's unpaid federal tax liability. Second, it seeks to impose transferee liability for that debt on Vance's former shareholders and their subsequent transferees, who are the beneficiaries of the scheme, by holding them liable for, among other things, their fraudulent conveyances.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1340 and 1345, and 26 U.S.C. § 7402.

5.    This action has been authorized by a delegate of the Secretary of the Treasury, and is brought at the direction of a delegate of the Attorney General of the United States, in accordance with 26 U.S.C. § 7401.

6.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this action occurred in this district, and under 28 U.S.C. § 1396 because the tax liabilities at issue accrued in this district.

---

[1] As of September 1, 2024, the total amount owed was $80,962,623.00.

## PARTIES[2]

7.      Plaintiff is the United States of America.

8.      Defendant Vance is a Delaware corporation with its principal office at 950 Third Avenue, 2nd Floor, New York, New York 10022. At the time of the Stock Sale, Vance had 17 shareholders. *See infra* ¶ 81.

9.      Defendant Antoinette Guerrini-Maraldi was a shareholder and director of Vance. Her last known address is 160 E. 72nd Street, New York, New York 10021. Before the Stock Sale, she owned 9.59 percent of Vance's stock in her own name. She is also a beneficiary of trusts that held additional Vance stock. Furthermore, in or about 2003, she received a distribution of $2,916,339.20, from the grantor-retained annuity trust ("GRAT") entered into on June 15, 2001, between Antoinette Guerrini-Maraldi, as grantor, and John Wilcox, Filippo Guerrini-Maraldi and Alessandro Guerrini-Maraldi, as trustees ("Antoinette Guerrini-Maraldi 2001 GRAT u/a dated 06/15/2001").[3] She is also named in her capacity as a trustee and beneficiary of the trust created

---

[2] Defendants Antoinette Guerrini-Maraldi, individually and as trustee; Melissa P. Roessler, individually, and as trustee and co-executor; Gustavo Roessler; Daniel S. Phelan; John V. Phelan; Michael C. Phelan; Piero Lucioli-Ottieri, as trustee and co-executor; Alessandro Guerrini-Maraldi, as trustee; Hancock Whitney Corporation, as trustee; and J.P. Morgan Trust Company, as trustee, all of whom received funds directly from the sale of Vance stock, are collectively referred to herein as the "Vance Shareholders."

Defendants Antoinette Guerrini-Maraldi; Melissa P. Roessler, individually and as co-executor; Gustavo Roessler, as trustee; Daniel S. Phelan; John V. Phelan; Michael C. Phelan; Laszlo Adam, as trustee; Kimberlee Phelan, as trustee; Tanya L. Phelan, as trustee; Piero Lucioli-Ottieri, individually and as co-executor; Isabella Santangelo; Alessandra Lucioli-Ottieri; Alessandro Guerrini-Maraldi; Filippo Guerrini-Maraldi; Vanessa Wilcox; and John Does 1-10, all of whom received subsequent transfers from the Vance Shareholders, are collectively referred to herein as the "Subsequent Transferees."

[3] The trust corpus of the Antoinette Guerrini-Maraldi 2001 GRAT u/a 10/25/2021 consisted of 700 shares of Vance stock. Before the Stock Sale, the trust held 6.18 percent of Vance's stock. The trust terminated in 2003, and distributions were made to Antoinette Guerrini-Maraldi, and her children Filippo Guerrini-Maraldi, Alessandro Guerrini-Maraldi, and Vanessa Wilcox.

for the benefit of Antoinette Guerrini-Maraldi under Article 10th of the will of Amanda Storrs ("Trust f/b/o Antoinette Guerrini-Maraldi under Will of Amanda Vance Storrs"). Before the Stock Sale, the Trust f/b/o Antoinette Guerrini-Maraldi under Will of Amanda Vance Storrs held 1.81 percent of Vance's stock.

10.    Defendant Melissa P. Roessler was a shareholder and director of Vance. Her last known address is 11785 Lost Tree Way, North Palm Beach, Florida 33408. Before the Stock Sale, she owned 1.31 percent of Vance's stock in her own name, and an additional 3.74 percent of Vance's stock jointly with her husband Gustavo Roessler. In addition, on information and belief, in or about 2012 and 2013, she received distributions from the Vance Non-GST Exempt QTIP Trust f/b/o James Phelan under the Will of Sondra Phelan ("Vance Non-GST Exempt QTIP Trust"), as a subsequent transferee.[4] She is also named in her capacity as a beneficiary and co-trustee of the GST Exempt Lifetime Trust created for the benefit of Melissa P. Roessler and issue under Section VI of Article One of the Will of Sondra Phelan ("Melissa Roessler GST Exempt Lifetime Trust"), which is a subsequent transferee of the Vance GST Exempt QTIP Trust f/b/o James Phelan under the Will of Sondra Phelan ("Vance GST Exempt QTIP Trust").[5] She is also

---

[4] The Vance Non-GST Exempt QTIP Trust was a non-generation-skipping transfer-exempt qualified terminable interest property trust created for the benefit of James Phelan, under Section IV(B) of Article One of the Last Will and Testament of Sondra Phelan (the "Will of Sondra Phelan"). Before the Stock Sale, the trust held 11.67 percent of Vance's stock. James Phelan was the sole beneficiary of the trust before his death. In 2014, after Phelan's death, the trust terminated, and its assets were distributed, pursuant to Section IV(B)(2) of Article One of the Will of Sondra Phelan, in equal shares to Sondra Phelan's children John Phelan, Michael Phelan, Daniel Phelan, and Melissa P. Roessler.

[5] The Vance GST Exempt QTIP Trust was a generation-skipping transfer-exempt qualified terminable interest property trust created for the benefit of James Phelan, under Section IV(A) of Article One of the Will of Sondra Phelan. Before the Stock Sale, the trust held 1.46 percent of Vance's stock. James Phelan was the sole beneficiary of the trust prior to his death. In 2014, the trust terminated, and its assets were distributed, pursuant to Section IV(A)(2) of Article One of the Will of Sondra Phelan, in equal shares to four successor GST Exempt Lifetime Trusts created for

named in her capacity as co-executor of the estate of Carolyn Lucioli-Ottieri, who resided in Rome, Italy, and passed away on November 3, 2021. Before the Stock Sale, Carolyn Lucioli-Ottieri owned 6.94 percent of Vance's stock in her own name. She was also a beneficiary of trusts that held additional Vance stock. In addition, in or about 2003, she received a distribution of $4,057,998.00, from the GRAT entered into under agreement dated October 25, 2001, between Carolyn Lucioli-Ottieri, as grantor, and Piero Lucioli-Ottieri, as trustee ("Carolyn Lucioli-Ottieri 2001 GRAT u/a dated 10/25/2021").[6] She is also named in her capacity as a trustee of the trust created for the benefit of Carolyn Lucioli-Ottieri under Article 10th of the will of Amanda Storrs ("Trust f/b/o Carolyn Lucioli-Ottieri under the Will of Amanda Vance Storrs"). Before the Stock Sale, the Trust f/b/o Carolyn Lucioli-Ottieri under the Will of Amanda Vance Storrs held 1.81 percent of Vance's stock. On or about March 22, 2023, Melissa Roessler was appointed successor trustee of the Trust f/b/o Carolyn Lucioli-Ottieri under the Will of Amanda Vance Storrs. As of March 21, 2023, the aggregate value of the assets held by the Trust f/b/o Carolyn Lucioli-Ottieri under the Will of Amanda Vance Storrs was approximately $8,535,000.

11.    Defendant Gustavo Roessler was a shareholder of Vance. His last known address is 11785 Lost Tree Way, North Palm Beach, Florida 33408. Before the Stock Sale, he owned 3.74 percent of Vance's stock jointly with his spouse Melissa Roessler. Gustavo Roessler is also named in his capacity as a co-trustee of the Melissa Roessler GST Exempt Lifetime Trust.

---

the benefit of Sondra Phelan's children John Phelan, Michael Phelan, Daniel Phelan, and Melissa P. Roessler, and their respective issue, to be disposed of in accordance with Section VI of Article One of the Will of Sondra Phelan.

[6] The trust corpus of the Carolyn Lucioli-Ottieri 2001 GRAT u/a 10/25/2021 consisted of 1,000 shares of Vance stock. Before the Stock Sale, the trust held 8.82 percent of Vance's stock. The trust terminated in 2003, and distributions were made to Carolyn Lucioli-Ottieri, and her children Piero Lucioli-Ottieri, Isabella Santangelo, and Alessandra Lucioli-Ottieri, who were the remainder beneficiaries of the trust.

12.     Defendant Daniel S. Phelan was a shareholder of Vance. His last known address is Calle Monoceros 14, Moncloa-Aravaca, 28023 Madrid, Spain. Before the Stock Sale, he owned 5.05 percent of Vance's stock in his own name. In addition, on information and belief, in or about 2012 and 2013, he received distributions from the Vance Non-GST Exempt QTIP Trust. He is also named in his capacity as a beneficiary and co-trustee of the GST Exempt Lifetime Trust created for the benefit of Daniel Phelan and issue under Section VI of Article One of the Will of Sondra Phelan ("Daniel Phelan GST Exempt Lifetime Trust").

13.     Defendant Laszlo Adam is named in his capacity as a co-trustee of the Daniel Phelan GST Exempt Lifetime Trust. His last known address is Gordon Pointe Capital, 780 Fifth Avenue, South Naples, Florida 34102.

14.     Defendant John V. Phelan was a shareholder and director of Vance. His last known address is 87 Sill Lane, Old Lyme, Connecticut 06371. Before the Stock Sale, he owned 5.05 percent of Vance's stock in his own name. In addition, on information and belief, in or about 2012 and 2013, he received distributions from the Vance Non-GST Exempt QTIP Trust. He is also named in his capacity as a beneficiary and co-trustee of the GST Exempt Lifetime Trust created for the benefit of John Phelan and issue under Section VI of Article One of the Will of Sondra Phelan ("John Phelan GST Exempt Lifetime Trust"). He is further named in his capacity as a co-trustee of the Daniel Phelan GST Exempt Lifetime Trust.

15.     Defendant Kimberlee Phelan is named in her capacity as a co-trustee of the John Phelan GST Exempt Lifetime Trust. Her last known address is WithumSmith+Brown, 506 Carnegie Center Drive, Suite 400, Princeton, New Jersey 08540.

16.     Defendant Michael C. Phelan was a shareholder of Vance. His last known address is 153 Whipple Way, Telluride, Colorado 81435. Before the Stock Sale, he owned 5.05 percent of

Vance's stock in his own name. In addition, in or about 2012 and 2013, he received distributions from the Vance Non-GST Exempt QTIP Trust. Michael C. Phelan is also named in his capacity as a beneficiary and co-trustee of the GST Exempt Lifetime Trust created for the benefit of Michael Phelan and issue under Section VI of Article One of the Will of Sondra Phelan ("Michael Phelan GST Exempt Lifetime Trust").

17.    Defendant Tanya L. Phelan is named in her capacity as a co-trustee of the Michael Phelan GST Exempt Lifetime Trust. She was appointed co-trustee of the Michael Phelan GST Exempt Lifetime Trust on July 18, 2014. Her last known address is 153 Whipple Way, Telluride, Colorado 81435.

18.    Defendant Piero Lucioli-Ottieri was a director of Vance and is named in his capacity as co-executor of the estate of Carolyn Lucioli-Ottieri, and as a subsequent transferee. His last known address is Via Leonardo Pisano, 16, Rome, Italy 00197. In or about 2003, he received a distribution of $744,179.58 from the Carolyn Lucioli-Ottieri 2001 GRAT u/a dated 10/25/2021. He is also named, on information and belief, in his capacity as co-trustee and remainder beneficiary of the trust created for the benefit of Carolyn Lucioli-Ottieri by Article 11th of the Last Will and Testament of Frank Vance Storrs ("Trust f/b/o Carolyn Lucioli-Ottieri under Article 11th of the Will of Frank Vance Storrs"). Before the Stock Sale, the Trust f/b/o Carolyn Lucioli-Ottieri under Article 11th of the Will of Frank Vance Storrs held 13.14 percent of Vance's stock. Pursuant to Article 11th of the Last Will and Testament of Frank Vance Storrs, the corpus of the trust was to be distributed to Carolyn Lucioli-Ottieri's children, per stirpes, upon her death. He is also named, on information and belief, in his capacity as co-trustee and remainder beneficiary of the trust created by a compromise agreement between the distributees of Frank Vance Storrs and his daughter Anne Storrs Schuster dated June 30, 1939, which was approved by order of the

Surrogate's Court of New York County, dated July 21, 1939 ("Trust f/b/o Carolyn Lucioli-Ottieri under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs"). Before the Stock Sale, that trust held 2.63 percent of Vance's stock. Pursuant to Paragraph 4(A) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Storrs, the corpus of the trust was to be distributed to Carolyn Lucioli-Ottieri's children, per stirpes, at the time of her death.

19.     Defendant Isabella Santangelo is named as a subsequent transferee. Her last known address is Via Barnaba Oriani, 10, Rome, Italy 00197. In or about 2003, she received a distribution of $738,988.51 from the Carolyn Lucioli-Ottieri 2001 GRAT u/a dated 10/25/2021. She is also a remainder beneficiary of the Trust f/b/o Carolyn Lucioli-Ottieri under Article 11th of the Will of Frank Vance Storrs, and of the Trust f/b/o Carolyn Lucioli-Ottieri under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs.

20.     Defendant Alessandra Lucioli-Ottieri is named as a subsequent transferee. Her last known address is Lungotevere Flaminio, 46, Rome, Italy 00196. In or about 2003, she received a distribution of $738,988.50 from the Carolyn Lucioli-Ottieri 2001 GRAT u/a dated 10/25/2021. She is also a remainder beneficiary of the Trust f/b/o Carolyn Lucioli-Ottieri under Article 11th of the Will of Frank Vance Storrs, and of the Trust f/b/o Carolyn Lucioli-Ottieri under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs.

21.     Defendant Alessandro Guerrini-Maraldi was a director of Vance and is named as a subsequent transferee. His last known address is 11 Elm Park Road, London SW3 6BP, United Kingdom. In or about 2003, he received a distribution of $496,277.89 from the Antoinette Guerrini-Maraldi 2001 GRAT u/a dated 06/15/2001. He is also named, on information and belief, in his capacity as co-trustee and presumptive remainder beneficiary of the trust created for the

benefit of Antoinette Guerrini-Maraldi under Article 11th of the Will of Frank Vance Storrs ("Trust f/b/o Antoinette Guerrini-Maraldi under Article 11th of the Will of Frank Vance Storrs"), which was probated in New York. Before the Stock Sale, the Trust f/b/o Antoinette Guerrini-Maraldi under Article 11th of the Will of Frank Vance Storrs held 13.14 percent of Vance's stock. He is also a presumptive remainder beneficiary of the Trust f/b/o Antoinette Guerrini-Maraldi under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs.

22.    Defendant Filippo Guerrini-Maraldi is named as a subsequent transferee. His last known address is 12 Hobury Street, London SW10 OJB, United Kingdom. In or about 2003, he received a distribution of $496,278.21 from the Antoinette Guerrini-Maraldi 2001 GRAT u/a dated 06/15/2001. He is also a presumptive remainder beneficiary of the Trust f/b/o Antoinette Guerrini-Maraldi under Article 11th of the Will of Frank Vance Storrs, and of the Trust f/b/o Antoinette Guerrini-Maraldi under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs.

23.    Defendant Vanessa Wilcox is named as a subsequent transferee. Her last known address is 580 West End Avenue, New York, New York 10024. In or about 2003, she received a distribution of $496,277.89 from the Antoinette Guerrini-Maraldi 2001 GRAT u/a dated 06/15/2001. She is also a presumptive remainder beneficiary of the Trust f/b/o Antoinette Guerrini-Maraldi under Article 11th of the Will of Frank Vance Storrs, and of the Trust f/b/o Antoinette Guerrini-Maraldi under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs.

24.    Defendant Hancock Whitney Corp. is named in its capacity as corporate co-trustee of the Trust f/b/o Carolyn Lucioli-Ottieri under Article 11th of the Will of Frank Vance Storrs, and

of the Trust f/b/o Carolyn Lucioli-Ottieri under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs. Its address is Hancock Whitney Plaza, 2510 14th Street, Gulfport, Mississippi 39501.

25.     Defendant J.P. Morgan Trust Company of Delaware is named in its capacity as corporate co-trustee of the Trust f/b/o Antoinette Guerrini-Maraldi under Article 11th of the Will of Frank Vance Storrs, and of the Trust f/b/o Antoinette Guerrini-Maraldi under Paragraph 4(A) of Agreement dated 6/30/1939, modifying Article 11th of the Will of Frank Storrs. Its address is 500 Stanton Christiana Road, Newark, Delaware 19713.

26.     Defendants John Does 1-10 are subsequent transferees and or distributees of the Vance Shareholders and the Subsequent Transferees who are not yet known to the United States but who may become known during discovery in this case at which time the United States shall seek to add or substitute them.

## FACTUAL ALLEGATIONS

### A.    Intermediary Transaction Tax Shelters

27.     As a general matter, when a taxpayer disposes of a capital asset that has appreciated in value, the taxpayer must pay tax on the capital gain. 26 U.S.C. §§ l(h), 1001, 1011, 1012, 1221, 1222. The capital gain is the difference between the amount realized from the disposition of the asset and the asset's "adjusted basis," which is the cost originally paid by the taxpayer, subject to certain adjustments permitted by tax law.

28.     Intermediary or "Midco" transaction tax shelters involve corporations that typically are (or, by operation of the transaction, will be) holding almost entirely cash or cash equivalents (including marketable securities) and whose only liabilities are federal, state, and/or local taxes. The transactions are designed to enable the corporation's shareholders to realize the value of the corporation's appreciated assets without paying corporate-level taxes on the built-in gain.

29.    Pursuant to this type of shelter, a third party—usually a tax-shelter promoter—agrees to purchase the corporation's stock (*i.e.*, the shares in the corporation) at a price equal to the market value of the assets (*i.e.*, the cash and securities) that the corporation owns, minus a premium which often is equal to a percentage of the corporate tax due on the capital gains of those assets (which the promoter keeps as its fee). The promoter does this by creating an intermediary entity (or "Midco") and causes it to acquire the corporate stock. The sole purpose of the Midco is to facilitate the transaction.

30.    The promoter is able to offer such a generous price for the corporate stock—far in excess of what it is worth given the significant tax liability inherent in the underlying assets—because the parties to the transaction intend to avoid that liability improperly. That avoidance is typically accomplished by offsetting the gains realized on the disposition of the assets with artificial losses generated by another tax shelter transaction.[7] In some cases, the promoter finds a lender that finances the stock purchase if the promoter agrees to immediately repay the loan or to fully secure the loan with the corporation's assets.

31.    By selling their stock to a promoter-controlled Midco rather than causing the corporation to sell its assets, pay the realized tax, and distribute the remaining proceeds, the shareholders receive more than the net value of the corporation's assets because they have avoided paying corporate taxes. Although the promoter acquires the corporate stock for an amount greater than its net asset value, it earns a profit funded by non-payment of the corporate taxes. All of this occurs at the expense of the IRS (and state tax authorities), because the corporate taxes go unpaid.

---

[7] One such type of transaction, commonly referred to as a "Son-of-BOSS" transaction, was listed as an abusive tax shelter in IRS Notice 2000-44, published on September 5, 2000, and is described in further detail *infra* ¶ 85 & n.24.

32.     Even when the IRS discovers such schemes in time to adjust the corporation's tax return and reject the improper tax treatment, it cannot collect the resulting tax from the corporation because, by design, the corporation has few, if any, assets remaining after the transaction concludes. Thus, avoidance of the corporate tax ultimately is achieved by rendering the corporation insolvent by the time the IRS learns of the transaction. Similarly, the Midco is designed to have no assets from which the IRS can collect after the transaction, and is sometimes dissolved altogether.

33.     These transactions amount to fraudulent conveyances that unjustly enrich the corporation's shareholders at the expense of the United States. For that reason, the IRS listed them in IRS Notice 2001-16, which was published on February 26, 2001, well in advance of the transaction at issue here. That notice announces that the IRS "intends to challenge the purported tax results of intermediary tax shelters." At the time of the Stock Sale, the IRS required taxpayers that participated, directly or indirectly, in such transactions to report those transactions to the IRS pursuant to 26 C.F.R. § 1.6011-4T (now codified at 26 C.F.R. § 1.6011-4), or risk being subject to penalties under 28 U.S.C. §§ 6707 and 6708.

**B.    Vance and the Vance Shareholders**

34.     Frank Vance Storrs ("Storrs"), who created and sold theater programs, was the founder and President of Vance, which was incorporated in Delaware in 1923. It is not clear what business activities Vance engaged in during its early years, but at the time its stock was sold in April 2002, it was primarily an investment holding company and its primary asset was a portfolio of appreciated investment securities.

35.     One of Storrs's daughters, Carolyn Storrs Sickles, and her issue, through trusts, inherited most of Storrs's ownership in Vance. Sickles had three daughters: Carolyn Lucioli-

Ottieri,[8] Antoinette Guerrini-Maraldi,[9] and Sondra Phelan.[10] Vance operated as a personal holding company and remained owned by Storrs' descendants through April 5, 2002, the date of the Stock Sale.

36.     Prior to the sale, Vance was managed by the husband of Antoinette Guerrini-Maraldi, Demitrio Guerrini-Maraldi ("Guerrini-Maraldi"), and the husband of Sondra Phelan, James J. Phelan ("James Phelan"). Guerrini-Maraldi was the President and James Phelan was the Vice President.

37.     Guerrini-Maraldi was for many years a re-insurance broker with Lloyd's of London and James Phelan was an executive with Chase Manhattan Bank. Guerrini-Maraldi and James Phelan both resided in New York and Vance had a New York business address. Guerrini-Maraldi died in 2002 at the age of 76, and James Phelan died in 2012 at the age of 78.

## C.     The Vance Shareholders Wanted to Sell the Company Without Incurring a Large Tax Liability

38.     Around 1999, the younger generations of Storrs's descendants became concerned about the continuity of management because Guerrini-Maraldi and James Phelan were approaching retirement age and had health issues. The Vance Shareholders determined that no member of the next generation could manage Vance. They considered selling their entire portfolio of investment securities, but also sought information about other methods of maximizing the value of Vance.

---

[8] Carolyn Lucioli-Ottieri's children are Piero Lucioli-Ottieri, Isabella Santangelo, and Alessandra Lucioli-Ottieri.

[9] Antoinette Guerrini-Maraldi's children are Vanessa Wilcox, Alessandro Guerrini-Maraldi, and Filippo Guerrini-Maraldi.

[10] Sondra Phelan's children are John Phelan, Daniel Phelan, Michael Phelan, and Melissa Roessler. Sondra Phelan died in 1999.

39.     In late 1999 or early 2000, Vance's attorneys at the law firm of Brauner Baron Rosenzweig & Klein LLP ("Brauner Baron"),[11] principally Christopher Schwabacher and Charles Damato, were asked to explore different structures that might be useful in "unlocking shareholder value." Brauner Baron engaged another law firm with tax expertise, Roberts & Holland LLP, to assist it in developing strategies that might be useful to Vance. The Brauner Baron attorneys met with Stuart Gross and Quincy Cotton from Roberts & Holland to discuss different options.

40.     In November 2000, Brauner Baron and Roberts & Holland prepared an eight-page memorandum for the Vance Shareholders entitled "Summary of Options for Restructuring." The purpose of the memo was to summarize several alternatives that would achieve the ultimate goal, to varying degrees, of eliminating the double taxation that would result from the fact that Vance was a "C" corporation.[12] The memo identified each alternative's primary advantages and disadvantages and provided a preliminary estimate of its associated tax cost. The four alternatives were (1) Subchapter S Election, (2) Freeze Transactions, (3) Corporate Amalgamation, and (4) Discounted Cash Sale.

41.     According to Damato, the fourth option, the sale, was not one of the original options that Roberts & Holland had recommended. (Roberts & Holland had recommended the first three.) However, after the initial memo was prepared, Vance Vice President James Phelan told Brauner Baron that a stock sale was something Vance also wanted to consider and the sale option was added. Further, calculations by Vance's accountants were attached to the memo that showed, in

---

[11] In 2007, Brauner Baron merged with the law firm Windels Marx Lane & Mittendorf, LLP.

[12] As the memo explained, "Vance is a 'C' corporation, taxable under the classic system of corporate double taxation: the corporation is taxable on its earnings and the shareholders are taxable on distributions to them of those earnings, in full and at ordinary income rates."

general terms, the net proceeds to the majority of the shareholders from the fourth option applying several different assumptions.

42.     The memo was provided to the Vance Shareholders and formed the basis for a presentation to Vance's board. In November 2000, a special committee was established to explore, investigate, and make recommendations on the future of Vance. The committee consisted of John Wilcox, Gustavo Roessler, Piero Lucioli-Ottieri, Alessandro Guerrini-Maraldi, and Kimberlee Phelan, all of whom were Vance Shareholders or their family members. The bulk of the work was performed by John Wilcox, Gustavo Roessler, and Kimberlee Phelan. Information IRS obtained about each of these individuals during its later audit of Vance's 2002 tax return demonstrates that each of them had significant experience with sophisticated corporate transactions based on their professional background.

43.     At the time Kimberlee Phelan was interviewed by the IRS (in 2016), she was a tax partner with the accounting firm Withum Smith+Brown, where she began working in 1997. Prior to that she had worked at Coopers & Lybrand LLP from 1993 to 1997 and before that at Price Waterhouse LLP. Her professional expertise was in federal and international taxation and she worked on behalf of individuals and corporations. She graduated from Wellesley College with a degree in economics and international relations, earned a Master's in Business Administration in accounting and finance from the University of California, Los Angeles, and is a member of the American Institute of Certified Public Accountants. She obtained her Certified Public Accountant license in 1993 and is also a certified global management accountant. At the time of her interview, she resided and worked in Princeton, New Jersey.

44.     At the time John Wilcox was interviewed by the IRS (also in 2016), he was serving as the Chairman of Sodali, Ltd., an international consultancy providing companies and boards of

directors with advice and services relating to corporate governance, institutional relations, shareholder engagement, and strategic cross-border transactions. From 2005 to 2008, he served as Senior Vice President and Head of Corporate Governance at TIAA-CREF, one of the world's largest private pension systems. From 1990 to 2005, he was chairman of Georgeson & Company, a proxy and investor relations firm. He graduated from Harvard College, and received a Master's in English from the University of California, Berkeley, a Juris Doctor from Harvard Law School, and a Master of Laws in Corporate Law from New York University. At the time of his interview, Wilcox lived and worked in Manhattan.

45.    At the time of the IRS's audit, Gustavo Roessler was a financial advisor employed with Morgan Stanley with over 25 years of experience, a registered Investment Advisor with the Securities and Exchange Commission, and a registered broker with the Financial Industry Regulatory Authority ("FINRA"), and he held Series 7, 24, 31 and 66 licenses from FINRA. He lived and worked in Manhattan.

46.    As part of its consideration process, the Special Committee held a few meetings in New York and several conference calls. Kimberlee Phelan estimated her time commitment to the Special Committee at approximately 100 hours.

**D.    The Vance Shareholders Turn to a Tax Shelter Scheme**

47.    On June 4, 2001, an annual meeting of the Vance Shareholders was held in New York. Twenty-two people attended, including Vance Shareholders, accountants, bankers, and attorneys.[13] At the meeting, the Special Committee presented a document summarizing their

---

[13] The Vance Shareholders and relatives of Vance Shareholders in attendance at the June 4, 2001, meeting included: Alessandro Guerrini-Maraldi, Antoinette Guerrini-Maraldi, Demetrio Guerrini-Maraldi, Carolyn Lucioli-Ottieri, Piero Lucioli-Ottieri, Daniel Phelan, James Phelan, John Phelan, Kimberlee Phelan, Michael Phelan, Gustavo Roessler, Melissa Roessler, Derek Schuster, John Wilcox, and Vanessa Wilcox.

findings. According to the meeting minutes, the Special Committee presented four alternatives for

Vance: (1) Status Quo; (2) Freeze Transaction; (3) Liquidation; and (4) Sale. The minutes recorded

the following summary about the discussion of each of the alternatives:

> 1 – Status Quo was familiar to everyone and whilst it has achieved considerable success and has advantages in some ways it nonetheless is hindered by the double taxation problem thus rendering it tax inefficient.
>
> 2 – The Freeze Transaction is a very complicated formula which in addition to its complication might preclude an eventual sale of the company somewhere down the line.
>
> 3 – Liquidation – after corporate taxes on capital gains are paid and taxes to individual shareholders are paid the amount realized would be approximately $40.5 million out of assets valued at $72.5 million as per statement of April 30, 2001.
>
> 4 – Sale – sale of the company was also investigated and three potential buyers were discretely approached without revealing the name of Vance as the seller. These potential buyers are:
>
>> Diversified Group
>> Integrated Capital Resources
>> Fortrend International.

48.     As to the fourth option, the minutes continue, "It was the consensus of the

Committee members that the company could be sold for a fee 5% - 10% of the Unrealized Capital

Gains of the company's assets and the Committee expressed optimism that the eventual negotiated

fee could be closer to the 5% than the 10%. In monetary terms a fee of approximately $3 million

was mentioned as a possible achievable goal. The sale would thus produce $52.7 million in

proceeds which is considerably greater than $40.5 million which would be generated by

liquidation."

49.     The minutes further indicate that the three Special Committee members "made an

excellent detailed presentation" and that Kimberlee Phelan "had done much of the work with

figures and produced extensive spread sheets to substantiate her numbers. Protracted discussions

followed each step of the proposals but it became evident that the sale option was the preferable one to follow up."

50.    Carolyn Lucioli-Ottieri made a motion to sell the Vance stock, which was seconded by James Phelan and unanimously approved by all shareholders with the exception of Chase Bank (a trustee for certain of the shareholder trusts), which abstained.

51.    Kimberlee Phelan stated during her IRS interview that the liquidation option was not selected by the shareholders "because if we could find someone to buy our stock rather than liquidate the portfolio, there was a greater return to the shareholders. . . . If the corporation were to liquidate all of its assets, the corporation would pay corporate-level tax on the capital gain in its assets, and then that dividend would be double-taxed at the shareholder level whereas if the corporation could sell its stock, all of those capital gains would remain with the corporation, and the shareholders would report only the capital gain on the sale of their stock."

52.    At the June 4, 2001, shareholder meeting, Gustavo Roessler, a member of the Special Committee, suggested indemnifying the committee members for their actions, and it was agreed that a standard form of indemnification should be provided to the committee members. Instructions were given to attorney Charles Damato to provide committee members with a standard indemnification agreement.

**E.    The Vance Shareholders Solicit Proposals from Several Tax Shelter Promoters**

53.    After the Vance Shareholders approved the sale of Vance's stock, Kimberlee Phelan was charged with sending out offer request letters to the three identified potential buyers, obtaining letters of intent for the sale, and distributing them to the committee members. All three

of the potential buyers identified by the Special Committee were promoters of tax shelters.[14] Special Committee member John Wilcox recalled that he learned about one of the potential buyers, The Diversified Group ("Diversified"), through his wife's cousin,[15] and believed the other two were identified either by other committee members or by Vance's lawyers.

54.    On November 7, 2001, Diversified sent Kimberlee Phelan a letter of intent expressing an interest in purchasing all of Vance's outstanding stock. Diversified offered a cash purchase price, equal to the market value of the assets (determined with reference to their closing prices on the closing date), less 5.5% of the unrealized capital gains. That is, Diversified proposed to buy Vance's stock for the value of its assets—ignoring the large anticipated capital gains tax liability—in exchange for a fee equal to a fraction of that liability. Diversified stated that it expected to finance some or all of the purchase price, but indicated that the closing would not be subject to a financing contingency. The letter indicated Diversified had a close working relationship with an AAA-rated financial institution and had completed numerous similar acquisitions in the past. Handwritten changes on the letter indicated that the 5.5% was reduced to 5%. This revised 5% offer resulted in a stock purchase price of $65.35 million.

55.    On November 16, 2001, Howard Teig, representing Value Financial Statutory Trust (Integrated Capital Associates), presented Gustavo Roessler and Kimberlee Phelan with a proposal

---

[14] *See Tricarichi v. Comm'r*, 110 T.C.M. (CCH) 370 (2015), *aff'd*, 752 F. App'x 455 (9th Cir. 2018) (describing Fortrend as a "leading promoter[] of Midco transactions"); *Shockley v. Comm'r*, 109 T.C.M. (CCH) 1579 (2015) (describing similar Midco transactions proposed by Diversified, Fortrend, and Integrated Capital Associates).

[15] Wilcox recalled that his wife's cousin, Andrew Namm, gave him Diversified's contact information and Wilcox then contacted Diversified's President, James Haber. Namm had sold a family company that held stocks, similar to Vance, to Diversified. Namm and other former stockholders of his family company, Arebec Corporation, were later involved in litigation with the IRS related to a transaction similar to the one at issue here. *See Trust u/w/o BH and MW Namm v. Comm'r*, T.C. Memo. 2018-182 (2018).

to acquire all of Vance's outstanding stock for 92.0% of the fair market value of Vance's assets on the day prior to the closing date less the amount of Vance's liabilities. This offer resulted in a stock purchase price of $62.56 million.

56.    On November 16, 2001, Fortrend International presented Kimberlee Phelan with a plan to acquire all of the stock of Vance through a company called Silver Dawn, Inc. The stock purchase price was to be paid in cash, which Silver planned to finance through Rabobank Nederlands in New York. Based on the assumption that the aggregate fair market value of the underlying Vance assets was $68 million with a tax basis of $15 million, the stock purchase price was calculated as $64.42 million.

57.    According to Kimberlee Phelan, the potential buyers may have had losses that would offset the built-in capital gains of Vance's underlying assets, but she did not know what type of losses those were or whether anyone had asked the buyers if they had losses or why they were interested in purchasing Vance's stock for an amount that would result in a large loss once capital gains taxes were paid on the appreciated assets.

58.    Ultimately, Vance accepted the offer from Diversified, which was the highest bidder. Much of the communication with Diversified was handled by Vance's Brauner Baron attorneys, who communicated with Diversified's Chief Financial Officer John Huber and its President and founder James Haber, and with Diversified's attorneys at Proskauer Rose LLP ("Proskauer"). In addition, between November 2001 and the close of the sale to Diversified in April 2002, both John Wilcox and Gustavo Roessler communicated directly with Diversified's attorney Ira Akselrad at Proskauer, concerning the sale transaction.[16]

---

[16] The meeting minutes from the June 4, 2001, shareholder meeting reflect that attorneys Chris Schwabacher and Charles Damato of Brauner Baron advised that the anticipated sale of Vance

59.     The Stock Sale took place more than a year after the IRS had published Notice 2001-16 (on February 26, 2001), and after the U.S. District Court for the Southern District of New York issued its opinion in *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445 (S.D.N.Y. 2001) (on March 22, 2001), which described Diversified as a firm "in the business of conceiving and marketing products and methods designed to help taxpayers minimize their corporate and/or personal income taxes," whose business included "developing tax strategies and using them in transactions meeting clients' particular business and investment objectives," *id.* at 448. This opinion also describes the same "tax strategy" developed by Diversified that was utilized to create the artificial tax losses in connection with the Intermediary Transaction. *See infra* ¶¶ 83-85.[17]

60.     According to interviews conducted during the IRS's audit, at the time of the Stock Sale, neither the Vance Shareholders nor their advisors at Brauner Baron knew who owned or managed the entity set up by Diversified that actually purchased the Vance shares, VCO Acquisition Ltd. ("VCO"). Kimberlee Phelan, John Wilcox, and Charles Damato all stated that they did not know what assets VCO owned or what it intended to do with the portfolio of marketable securities it was purchasing.

---

should not take place before 2002 for legal reasons that have been withheld under the attorney-client privilege.

[17] Diversified defined this "option partnership strategy" involving paired European-style digital options as follows:

> The option partnership strategy is a tax-saving strategy wherein a taxpayer purchases and writes options and transfers these option positions to a partnership so as to create substantial increased basis in the partnership interest. As a result of these trades and transfer, the taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of purchased call options, but is not reduced as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options.

*Daugerdas*, 139 F. Supp. 2d at 450 (quoting a Diversified letter). As discussed further below, this is an abusive "Son-of-BOSS" tax shelter that is the subject of an IRS notice. *See infra* ¶ 85 & n.24.

61.    No due diligence was conducted personally by Kimberlee Phelan or John Wilcox. Further, according to Kimberlee Phelan and John Wilcox, the Special Committee members had no personal knowledge as to whether Vance's lawyers conducted additional due diligence in connection with the Stock Sale.

62.    As to the lawyers, Damato stated he did not research or investigate Diversified even though he had never heard of it before this transaction. He testified that he did not know who owned or managed Diversified or what assets it owned. Damato testified that at the time of the transaction, he did not know how Diversified or VCO obtained the money to purchase the stock. According to Damato, the Stock Sale transaction was different from the other transactions that Brauner Baron had previously worked on in that the sale amount was very high and the representations and warranties were less extensive than usual.

63.    Damato stated that at the time of the transaction, he did not know what Diversified or VCO intended to do with the shares of Vance or its underlying assets, but he believed that James Phelan told him that Diversified had some position that had losses that might be utilized to offset the taxable gains.

64.    Another Brauner Baron attorney, Christopher Chin, stated that he also conducted no due diligence on Diversified. He testified that all he knew was that Diversified was the buyer in a stock sale for cash, but did not know the type of business Diversified was in or who owned or managed it, and he did not speak to anyone at Diversified.

65.    Damato stated that Brauner Baron had sought advice from Roberts & Holland, including regarding whether additional due diligence should be done to ascertain whether the buyer had losses. Damato stated that Roberts & Holland indicated additional due diligence was not needed.

**F.**      **The Preparations for the Vance Intermediary Transaction**

66.      According to the records of the Delaware Secretary of State, VCO, the intermediary

entity that purchased Vance's stock, was formed on April 2, 2002, three days before the Stock

Sale. Diversified's Haber worked with Thomas Long, a Wyoming attorney, to form VCO with the

assistance of an Indian tribe, the Skull Valley Band of Goshute Indians ("SVB"). Per VCO's April

4, 2002, Operating Agreement, AC Acquisition LLC, a Wyoming limited liability company, was

the sole member of VCO. JSB Acquisition Corp. ("JSB") was VCO's Manager and Haber signed

the Operating Agreement as President of JSB.[18] In a Written Action dated April 4, 2002, by AC

Acquisition, as the sole member of VCO, Haber was appointed President, Treasurer, and Chief

Executive Officer of VCO and Irwin Rosen was appointed Secretary of VCO.

67.      The Stock Sale was effectuated via a Stock Purchase Agreement ("SPA"), dated

April 5, 2002, executed by the Vance Shareholders, as the sellers, and VCO, as the buyer. The

SPA was governed by New York law.

68.      Because the promoters wanted to purchase only Vance's cash and marketable

securities, the SPA included a partial redemption of Vance shares (the "Redemption Transactions")

to dispose of Vance's other, tangible assets. Those assets included the stock of several subsidiary

---

[18] There is also another VCO Operating Agreement dated March 28, 2002, that was executed by
Leon Bear, chairman of the SVB, consistent with an SVB Tribal Resolution. Pursuant to this
Operating Agreement, Diversified, as the Manager, and the SVB, as the member, desired to form
a Wyoming LLC and the SVB made an initial capital contribution of $50,000. In the signature
block of the Operating Agreement, Haber is listed as the President of Corporate Management
Services Corporation as the Manager of VCO. Bear signed as the Chairman of the SVB, as the
member of VCO. As sole member of VCO, the SVB was not permitted to take part in the
management of the LLC, transact any business in the name of the LLC, or have power to sign for
or bind the LLC. Rather these powers were vested in Corporate Management Services as the
Manager. This alternative Operating Agreement is not the one referenced in the executed Stock
Purchase Agreement, between VCO and the Vance Shareholders dated April 5, 2002 (discussed
in further detail below), which states that VCO is a Delaware LLC (not a Wyoming LLC), states
that JSB is the Manager of VCO, and is signed by Haber as the Director of JSB.

corporations as well as a pension plan. Vance transferred these assets to V Holding Company, LLC, a newly formed LLC owned by the Vance Shareholders, that was dissolved a year or two after the Stock Sale.

69.     Additionally, two of the Vance Shareholders had taken out loans from Vance that they needed to repay. The repayment of these loans was accomplished by adjusting the allocation of the Vance stock purchase price that VCO paid out to these shareholders.

70.     In preparation for the sale of the Vance stock to VCO, Vance's portfolio of securities, which had been held by the Wilmington Trust Company, were transferred to a UBS PaineWebber ("UBS") account (the "UBS Account"). The UBS Account statement for April 2002 shows cash deposits of approximately $9.1 million and securities transferred in with a value of approximately $59 million delivered to this account on April 5, 2002.

71.     Pursuant to the SPA, VCO acquired all 11,109.28 of the issued and outstanding shares of Vance that remained after the Redemption Transactions for $66,100,000, or $5,949.98 per share. The aggregate purchase price, minus a $250,000 escrow amount, was to be paid in cash by wire transfer to the Vance Shareholders.

72.     Schedule 2.7(a) of the SPA described the assets owned by Vance after the Redemption Transactions by attaching a Statement of Account as of February 28, 2002, for Vance's Wilmington Trust account showing investments in marketable securities and a money market fund. Schedule 2.7(b) of the SPA identified Vance's liabilities as "Taxes incurred during 2002."

73.     Pursuant to Section 5.1 of the SPA, VCO was required to prepare and file tax returns for tax periods ending after the closing date and was to pay or cause to be paid any taxes

owed for such tax periods, as well as to indemnify the Vance Shareholders for any taxes owed by Vance.

74.     Haber signed the SPA for the buyer as the Director of JSB, as the Manager of VCO. Antoinette Guerrini-Maraldi signed the SPA as a Vance director and as a Vance Shareholder in addition to signing on behalf of most of the other Vance Shareholders. Antoinette Guerrini-Maraldi, Vanessa Wilcox, and Melissa Roessler were named as agents and representatives of the shareholders for purposes of the SPA.

75.     Effective April 5, 2002, Guerrini-Maraldi resigned as President and Director of Vance, and James Phelan resigned as Vice-President and Director. Other officers and directors resigning effective the same date, included Alessandro Guerrini-Maraldi, Antoinette Guerrini-Maraldi, Carolyn Lucioli-Ottieri, Piero Lucioli-Ottieri, John Phelan, and Melissa Roessler. In addition, by letter dated April 5, 2002, James Phelan and Demetrio Guerrini-Maraldi informed UBS that they were resigning as Authorized Signatories of Vance.

76.     After the sale, Diversified's Haber, James Huber, and Irwin Rosen were elected as Directors of Vance by Vance's new sole stockholder, VCO. The action was signed by Haber, as the Director of JSB, as the Manager of VCO. Also, effective April 5, 2002, the new Vance Board of Directors, consisting of Haber, Huber, and Rosen, appointed Haber as President, Secretary, and Treasurer and Rosen as Vice President.

**G.     Financing VCO's Stock Purchase and the Transfer of Funds**

77.     VCO took out a short-term loan, fully secured by Vance's assets, in order to purchase the Vance stock. As described in detail below, immediately following the purchase, the Vance assets were liquidated and the loan was repaid in full.

78.     Specifically, on April 5, 2002, VCO borrowed $69 million from Utrecht-America Finance Co. ("UAFC"), a subsidiary of Rabobank. Pursuant to the Promissory Note for this loan,

VCO was required to repay the principal plus interest by May 4, 2002 (the "UAFC Promissory Note"). Additionally, under the UAFC Promissory Note, immediately after VCO acquired Vance, VCO was required to cause Vance to execute and deliver to UAFC a Security and Assignment Agreement and a Guaranty in favor of UAFC, which it did. VCO was also required to execute and deliver to UAFC a Purchase Agreement with UBS whereby UBS agreed to purchase all of the marketable securities owned by Vance. By letter dated April 5, 2002, from UBS to VCO, UBS offered to purchase those securities at prices equal to their closing prices as of April 5, 2002, for those securities listed on an exchange or traded over-the-counter, subject to a commission of $0.12 per share. VCO accepted the offer and Haber signed the UBS offer letter for VCO on April 5, 2002.

79.     Accordingly, at the time of the closing on the SPA, Vance's assets were already encumbered by the UAFC Promissory Note, which required Vance to sell all of its marketable securities to UBS and use the proceeds to repay the loan made by UAFC to VCO.

80.     The specific amounts of the sale proceeds for the Vance securities were finalized between April 10 and 21, 2002, with Vance ultimately receiving $59,251,669 in net sales proceeds from UBS after deducting all fees and expenses.

81.     On April 5, 2002, VCO paid the $65,850,000 purchase price for the Vance shares to the Vance Shareholders, which was distributed to the individual shareholders as follows:

| Shareholder Name | Percentage Share | Net Wire Transfer[19] |
|---|---|---|
| Trust f/b/o Carolyn Lucioli-Ottieri under Article 11th of the Will of Frank Vance Storrs | 13.14% | $8,783,464 |
| Trust f/b/o Antoinette Guerrini-Maraldi under Article 11th of the Will of Frank Vance Storrs | 13.14% | $8,783,464 |
| Vance Non-GST Exempt QTIP Trust f/b/o James Phelan under the Will of Sondra Phelan | 11.67% | $7,804,339 |
| Carolyn Lucioli-Ottieri 2001 GRAT u/a dated 10/15/2001 | 8.82% | $5,898,791 |
| Antoinette Guerrini-Maraldi | 9.59% | $5,700,933 |
| Carolyn Lucioli-Ottieri | 6.94% | $4,641,366 |
| Antoinette Guerrini-Maraldi 2001 GRAT u/a dated 6/15/2001 | 6.18% | $4,129,154 |
| Melissa P. Roessler and Gustavo S. Roessler | 3.74% | $3,376,527 |
| Daniel S. Phelan | 5.05% | $3,376,527 |
| John V. Phelan | 5.05% | $3,376,527 |
| Michael C. Phelan | 5.05% | $3,067,902 |
| Trust f/b/o Carolyn Lucioli-Ottieri under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs | 2.63% | $1,756,693 |
| Trust f/b/o Antoinette Guerrini-Maraldi under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs | 2.63% | $1,756,693 |
| Trust f/b/o Antoinette Guerrini Maraldi under the Will of Amanda Vance Storrs | 1.81% | $1,209,252 |
| Trust f/b/o Carolyn Lucioli-Ottieri under the Will of Amanda Vance Storrs | 1.81% | $1,209,252 |
| Vance GST Exempt QTIP Trust f/b/o James Phelan under the Will of Sondra Phelan | 1.46% | $979,118 |
| Melissa P. Roessler[20] | 1.31% | -- |
| **Total** | **100%** | **$65,850,000** |

---

[19] Individual shareholders' net wire transfer amounts do not reflect their exact *pro rata* ownership of shares because of the effect of the Redemption Transactions and the repayment of loans discussed above. *See supra* ¶¶ 68-69.

[20] The amount received for Melissa P. Roessler's 1.31% of shares is reflected in the $3,376,527 payment received by Melissa P. Roessler and Gustavo S. Roessler.

These payments were made from the VCO Rabobank Account to each shareholder's bank account. In addition, the $250,000 deposited into the escrow account held by Brauner Baron was subsequently distributed to the shareholders on a pro-rata basis.

82.     On April 8, 2002, $68,000,000 from the sale of the Vance securities (and cash) was transferred from Vance's UBS Account to the VCO Rabobank Account. On the same day, these proceeds were used to pay off the UAFC loan.

### H.    Creating Artificial Losses to Offset Vance's Tax Liability

83.     Upon the sale of Vance's marketable securities portfolio and other assets, Vance realized a substantial income tax liability. That liability was offset via a tax shelter set up by the promoters that created artificial tax losses totaling $48,938,329.

84.     To do this, the promoters set up two entities on April 10, 2002, VCO Investments LLC and VCO Trading LLC, both of which were managed by JSB. Vance was the sole member of VCO Trading, making a $25,000 capital contribution upon its formation, and later assigned its interest in VCO Trading to VCO Investments in exchange for an interest in VCO Investments. On April 12, 2002, Vance, through VCO Trading, simultaneously purchased from and sold to Refco Capital Markets, Ltd. ("Refco") paired European-style digital options[21] on the S&P 500 Index that were almost completely offsetting.[22] On May 31, 2002, Vance, through VCO Trading,

---

[21] "There are two basic types of options—American and European. A European option can be exercised only at maturity. An American option can be exercised anytime during the life of the option. A digital option has only two possible outcomes at expiration: some fixed payoff amount or nothing. Digital options are typically also European-style options, which means that they can be exercised only on the option's expiration date." *BCP Trading & Invs., LLC v. Comm'r*, 114 T.C.M. (CCH) 151 (2017), *aff'd*, 991 F.3d 1253 (D.C. Cir. 2021).

[22] The strike price for these paired options was nearly identical—$1,161.07 for the short position, and $1,161.04 for the long position—such that VCO Trading would neither gain nor lose any appreciable amount upon the exercising of the pair of options.

simultaneously purchased from and sold to Refco another set of paired European-style digital options on the S&P 500 Index that, again, were almost completely offsetting.[23]

85.     Netted against one another, the two sets of paired options Vance entered into through VCO Trading and VCO Investments provided no potential for Vance to realize material profits or losses. However, for tax purposes, Vance recognized the cost of the options it bought through VCO Trading and VCO Investments as a loss of approximately $48.97 million but did not recognize the income from the offsetting options it sold through those entities. This series of loss-generating transactions is known as a Son-of-BOSS tax shelter. *See* IRS Notice 2000-44.[24]

86.     Vance's 2002 federal income tax return reported a long-term capital gain from the sale of its securities in the Stock Sale. It reported a total sales price of $63,680,294 with a corresponding basis of $15,347,058, for a net long-term gain of $48,333,236. However, Vance's return also reported a $48,938,329 short-term capital loss as a result of the paired options

---

[23] The strike price for these paired options was also nearly identical—$1,161.04 for the short position, and $1,161.07 for the long position.

[24] "While there are different varieties of Son-of-BOSS deals, what they have in common is the transfer of assets encumbered by significant liabilities to a partnership with the goal of inflating basis in that partnership or its assets. The liabilities are usually options of some sort, and always include at least one that seems contingent at the time of transfer. Taxpayers who engage in these deals claim that this allows the partner to ignore those liabilities in computing his basis, which allows the partnership to ignore them in computing its basis. The result is that the partners will have bases high enough to provide for large noneconomic losses on their individual tax returns." *Greenberg v. Comm'r*, 115 T.C.M. (CCH) 1403 (2018), *aff'd*, 10 F.4th 1136 (11th Cir. 2021), *and aff'd*, No. 20-73023, 2021 WL 5985581 (9th Cir. Dec. 17, 2021); *see also NPR Invs., LLC ex rel. Roach v. United States*, 740 F.3d 998, 1001 (5th Cir. 2014) ("Courts, including our court and the district court in this case, have described a Son-of-BOSS transaction as a well-recognized abusive tax shelter. Artificial losses are generated for tax deduction purposes." (internal quotations and citations omitted)); *Markell Co. v. Comm'r*, 107 T.C.M. (CCH) 1447 (2014) (sustaining disallowance of the "giant loss" generated by Son-of-BOSS transaction involving James Haber).

transactions discussed above.[25] As a result, Vance reported an overall capital loss of $605,093 for 2002, and indicated that it was entitled to a tax refund for that year.

87.     Vance failed to register or otherwise report the Intermediary Transaction to the IRS on its 2002 tax return despite being required to do so by Notice 2001-16. The Vance Shareholders also failed to register or otherwise report the Intermediary Transaction on their respective tax returns. *See supra* ¶ 33.

## I.     Results of the Tax Shelter Scheme: Vance Is Left with a Tax Liability It Cannot Pay While Former Shareholders Benefit

88.     As of April 5, 2022, when it entered into the SPA, Vance was insolvent because its debts, which included its tax liability, substantially exceeded its liabilities:

Assets Total: $68,727,800
    $9,100,498 in cash
    $59,251,669 in net proceeds from marketable securities sold to UBS
    $30,633 in prepaid income tax
    $345,000 guarantor fee

Debts Total: $89,058,293
    $16,433,300 in estimated federal tax
    $3,624,993 in estimated New York state tax
    $69,000,000 in agreements to repay the UAFC loan to VCO

89.     Further, VCO systematically depleted its assets as well as the assets of Vance such that neither entity would be able to pay any tax obligations once the IRS disallowed the loss generated by the Son-of-BOSS transactions. Specifically, VCO transferred $66,100,000 to the Vance Shareholders and used the proceeds from the sale of securities to UBS to repay the UAFC loan. In addition, cash was removed from Vance's accounts during 2002, leaving the corporation with assets of $484,021 in cash and $30,633 in prepaid federal income tax at the end of that year. Vance's 2003 and 2004 federal income tax returns show cash distributions of $483,956 and $9,500,

---

[25] This figure incorporates an additional short-term loss from one of Vance's original securities.

respectively. On information, these distributions were made to VCO, as it was Vance's only shareholder. By the end of 2004, Vance's only asset was $528 in cash.

90.    The Intermediary Transaction resulted in the Vance Shareholders realizing an estimated federal tax savings of $12,904,973 (which would include the 5% of unrealized capital gains totaling $2,416,662, paid to Diversified as a promoter fee) compared to what they would have paid had Vance sold its stock portfolio itself and then liquidated the corporation after paying the tax due on the asset sale.

**J.    The IRS's Collection Efforts**

91.    Vance filed its corporate income tax return for 2002 on September 16, 2003. The IRS examined this return, and ultimately disallowed $48,938,329 in claimed short-term capital losses. On May 31, 2006, Vance consented to extend the assessment statute of limitations until December 31, 2007. On December 27, 2007, the IRS issued Vance a statutory Notice of Deficiency for an income tax deficiency of $16,490,362 (reflecting the capital gains tax owed after disallowing the artificial loss) plus an underpayment penalty under 26 U.S.C. § 6662(h) of $6,776,144.

92.    Vance timely petitioned the U.S. Tax Court to challenge the Notice of Deficiency (which suspended the statute of limitations on assessment) on March 25, 2008. On April 22, 2014, the Tax Court issued an Order and Decision upholding the full deficiency and penalty in the Notice of Deficiency. *See Vance Finance & Holding Corp. v. Comm'r,* No. 7245-08, Dkt. No. 43 (T.C. Apr. 22, 2014). On July 21, 2014, the Tax Court's Order and Decision became final, ninety days after it was issued. *See* Fed. R. App. Proc. 13(a)(1). Defendants are collaterally estopped from challenging the fact of or amount of Vance's tax deficiency or penalty due to this decision, which binds Vance, the Vance Shareholders, and any subsequent transferees. *See Krueger v. Comm'r*, 48 T.C. 824, 829 (1967); *see also First National Bank of Chicago v. Comm'r*, 112 F.2d 260, 262 (7th

Cir. 1940); *Estate of Egan v. Comm'r*, 28 T.C. 998 (1957), *aff'd*, 260 F.2d 779 (8th Cir. 1958);

*Jahncke Service, Inc. v Comm'r*, 20 B.T.A. 837 (1930).

93.     The statute of limitations on assessment remained suspended for sixty days from

the date the Tax Court's Order and Decision became final, or until September 19, 2014. *See* 26

U.S.C. § 6503(a)(1). On September 12, 2014, the IRS timely assessed the tax and penalty against

Vance.

94.     The IRS then began attempting to collect these amounts. On January 6, 2015, the

IRS issued a Notice of Intent to Levy, Notice of Federal Tax Lien, and Collection Due Process

("CDP") Notice to Vance, and filed a Notice Federal Tax Lien ("NFTL"). On March 18, 2015,

Vance requested a CDP Hearing, and on or about June 1, 2015, Vance filed a Doubt as to

Collectability Offer in Compromise ("OIC"), in which it did not dispute the liability it owed (which

had already been determined by the Tax Court's order, which Vance did not appeal), but indicated

that the IRS should accept a small amount in satisfaction of its liability because Vance had no

assets to pay. Vance offered to pay the IRS a mere $1,000 in full satisfaction of its income tax

deficiency of $16,490,362 and underpayment penalty of $6,776,144. Vance paid $200 upon

submitting the OIC and proposed that it would pay the remaining $800 within one month of the

IRS's acceptance of its proposal. Significantly, Vance's proposal conditioned its offer on the IRS

agreeing to accept the $1,000 payment not only in satisfaction of Vance's own tax liabilities, but

also any liability its transferees or other persons might have for Vance's outstanding tax debt.

Vance's proposal was first evaluated by an IRS Revenue Officer and then sent to the IRS Appeals

Office. On October 6, 2016, the IRS Appeals Office issued a CDP Notice of Determination to

Vance sustaining the NFTL, sustaining the proposed levy action, and rejecting Vance's OIC.

95.    On November 3, 2016, Vance timely petitioned the Tax Court to dispute the CDP Notice of Determination. In a decision entered on December 7, 2022, as clarified by an order on January 10, 2023, the Tax Court sustained the CDP Notice of Determination. *Vance Finance & Holding Corp. v. Comm'r*, No. 23761-16L, Dkt. No. 50 (T.C. Jan. 10, 2023). On March 2, 2023, Vance appealed this determination to the U.S. Court of Appeals for the Second Circuit, which has not yet decided the appeal. *Vance Finance & Holding Corp. v. Comm'r*, No. 23-353 (2d Cir. argued Feb. 5, 2024). Because this appeal concerns only the IRS's efforts to collect from Vance and to do so administratively, it need not be resolved before this transferee-liability case can proceed.

96.    Vance's assets, last reported (on its 2016 tax return) as $31, are insufficient to pay any tax and penalty assessments. In light of this, it is not possible for the Government to collect the liabilities at issue from Vance alone.

**K.    The Vance Shareholders Are Liable for Vance's Tax Liability as Transferees**

97.    The United States may seek to impose transferee liability against those who received the property of an insolvent taxpayer. 26 U.S.C. § 7402; *Leighton v. United States*, 289 U.S. 506 (1933); *United States v. Russell*, 461 F.2d 605 (10th Cir. 1972). Specifically, the United States may file suit to impose personal liability on transferees under 26 U.S.C. § 7402(a) pursuant to state fraudulent conveyance law. *See Hall v. United States*, 403 F.2d 344 (5th Cir. 1968); *Bailey v. United States*, 415 F. Supp. 1305 (D.N.J. 1976); *see also United States v. Henco Holding Corp.*, 985 F.3d 1290 (11th Cir. 2021).

98.    Federal law provides that the United States may collect a timely assessed tax by instituting a proceeding in court, if the proceeding is begun within ten years after the assessment of the tax. *See* 26 U.S.C. § 6502(a). Because the tax at issue in this action was timely assessed, and this action has been filed within ten years of that assessment, this action is timely. Further, the statute of limitations has been suspended since the filing of Vance's CDP case on March 18, 2015,

pursuant to 26 U.S.C. § 6330(e)(1). The United States is entitled to a money judgment against the Vance Shareholders and their subsequent transferees, and is not bound by New York's statute of limitations for fraudulent transfers. *See United States v. Summerlin*, 310 U.S. 414, 416 (1940).

99.     The Vance Shareholders are liable for Vance's unpaid tax liability pursuant to the New York Uniform Fraudulent Conveyance Act ("NYUFCA"),[26] N.Y. Debt. & Cred. Law §§ 270-281, and under New York's common-law trust fund doctrine and theories of unjust enrichment and money had and received.

100.     New York law applies because New York has the most substantial relationship to the facts of this case. Vance conducted its business in New York from inception through when its assets were sold. At the time of the sale, most of the individual Vance Shareholders resided in New York, the situs of most of the trusts that held Vance stock were in New York, and the closing of the sale took place in New York. In addition, the accounts from which the transfers were made to the Vance Shareholders at the time of the closing were located in New York. Further, VCO, Diversified, and JSB were located at the same New York address, and Haber resided in New York. Vance's securities portfolio was moved to the UBS account in New York, and the proceeds of the sale of securities were deposited into this New York UBS account and then transferred to VCO's UBS account in New York and used to repay the UAFC loan and fees.

---

[26] On December 19, 2019, New York amended Article 10 of its Debtor and Creditor Law to replace the NYUFCA with the New York Uniform Voidable Transactions Act ("NYUVTA"), which became effective on April 4, 2020. *See* 2019 N.Y. Laws, ch. 580. However, because the NYUVTA only applies to transfers that occurred on or after that date, *id.* § 7 (stating that NYUVTA "shall not apply to a transfer made or obligation incurred before [the] effective date"), the NYUFCA applies here, *see Varbero v. Belesis*, No. 20 Civ. 2538 (LJL), 2020 WL 5849516, at *5 (S.D.N.Y. Oct. 1, 2020) (applying NYUFCA in case involving pre-amendment transactions).

## CLAIMS FOR RELIEF

## COUNT I: REDUCE UNPAID FEDERAL TAX LIABILITY TO JUDGMENT
(against Vance)

101.    The United States repeats and realleges the allegations in paragraph 1 through 100 with the same force and effect as if set forth fully herein.

102.    On April 22, 2014, the U.S. Tax Court determined that Vance owes income tax of $16,940,362.00 and a penalty under 26 U.S.C. § 6662(h) of $6,776,144.80 for tax year 2002. *Vance Finance & Holding Corp. v. Comm'r*, No. 7245-08, Dkt. No. 43 (T.C. Apr. 22, 2014).

103.    Following this determination, the IRS timely assessed Vance's income tax liability for tax year 2002, on September 12, 2014.

104.    As a result of the Tax Court's decision, Vance is estopped from challenging the assessment at issue in this case.

105.    Pursuant to 26 U.S.C. § 6502(a), the United States has ten years following an assessment to bring an action to reduce a liability to judgment. An assessment was timely made on September 12, 2014. Further, the statute of limitations has been suspended since the filing of Vance's CDP case on March 18, 2015, pursuant to 26 U.S.C. § 6330(e)(1).

106.    Interest on Vance's unpaid liability for the tax year ending December 31, 2002, and the associated penalty, has been accruing and continues to accrue as provided by law.

107.    Accordingly, pursuant to 26 U.S.C. § 7402, the United States is entitled to a judgment in the amount of Vance's unpaid federal tax liability and penalty for tax year 2002, which as of September 1, 2024, totals $80,962,623.00, plus interest and statutory additions from September 1, 2024.

## COUNT II: NYUFCA §§ 273-275, 278
## CONSTRUCTIVE FRAUDULENT CONVEYANCE
### (against all Defendants)

108.    The United States repeats and realleges the allegations in paragraph 1 through 100 with the same force and effect as if set forth fully herein.

109.    The conveyances of property, including funds, between the Vance Shareholders and VCO, Vance and UBS, and UBS and VCO, when collapsed into one overarching transaction, were fraudulent conveyances.

110.    These conveyances include the April 5, 2002, sale of Vance stock from the Vance Shareholders to VCO, the sale of marketable securities owned by Vance to UBS on or about April 5, 2022, and the subsequent transfer of funds from UBS to VCO on April 8, 2002.

111.    When collapsing all of the transactions conveying property between the Vance Shareholders and VCO (the Stock Sale), Vance and UBS (the sale of marketable securities), and UBS and VCO (the transfer of sale proceeds), the conveyances were made without fair consideration.

112.    Vance was rendered insolvent by the conveyances between the Vance Shareholders and VCO, Vance and UBS, and UBS and VCO, considered collectively.

113.    At the time of the conveyances described above, considered collectively, Vance was engaged in, or about to engage in, a transaction for which the property remaining in its possession after the conveyances was unreasonably small capital.

114.    At the time of the conveyances described above, considered collectively, Vance intended or believed that it would incur debts beyond its ability to pay as they matured.

115.    In the context of the conveyances between the Vance Shareholders and VCO, Vance and UBS, and UBS and VCO, Vance and VCO should be treated as a single entity.

116.    In addition, the further conveyances of property from the Vance Shareholders to Subsequent Transferees were made without fair consideration and/or with knowledge of the fraud.

117.    Each of the parties to these conveyances knew or should have known that Vance would incur tax liability to the United States that it would not be able to pay. To the extent that any party lacked actual knowledge, it actively avoided such knowledge, failed to conduct ordinary diligence that would have provided such knowledge, or failed to inquire in the face of circumstances that should have led to further inquiries that would have provided such knowledge.

118.    Each of the parties to these conveyances knew or should have known that these conveyances would hinder, delay, and defraud the United States. To the extent that any party lacked actual knowledge, it actively avoided such knowledge, failed to conduct ordinary diligence that would have provided such knowledge, or failed to inquire in the face of circumstances that should have led to further inquiries that would have provided such knowledge.

119.    Had the Vance Shareholders sold the assets of Vance directly, the tax liabilities would have caused them to realize an amount substantially less than what they actually received.

120.    Accordingly, pursuant to NYUFCA Sections 273, 274, 275, and 278, to the extent necessary to satisfy the United States' federal tax claim against Vance, the United States is entitled to judgment against all defendants (i) setting aside the conveyances; (ii) disregarding the conveyances and allowing the United States to attach or levy execution upon property conveyed; and (iii) awarding the value of the property, including interest or appreciation, to the maximum extent allowed by law.

## COUNT III: NYUFCA §§ 276, 278
## ACTUAL FRAUDULENT CONVEYANCE
### (against all Defendants)

121.    The United States repeats and realleges the allegations in paragraph 1 through 100 with the same force and effect as if set forth fully herein.

122.    Defendants entered into conveyances, and caused tax liability to be incurred by Vance, with the actual intent to hinder, delay, and defraud the United States as a creditor of Vance.

123.    These conveyances include the April 5, 2002, sale of Vance stock from the Vance Shareholders to VCO, and the sale of marketable securities owned by Vance on or about April 5, 2022, to UBS.

124.    These conveyances, collapsed as a single transaction, involved the transfer of property (including funds) to and from VCO in amounts that are only economically rational if the tax liabilities associated with the stock owned by Vance are disregarded.

125.    The parties to these conveyances were sophisticated corporate actors who were well aware of the tax implications of the transactions.

126.    These conveyances were made without fair consideration.

127.    These conveyances were questionable transfers not made in the ordinary course of business.

128.    A close relationship existed between certain of the parties to these conveyances.

129.    VCO was a shell company created and used solely for the purpose of these conveyances.

130.    In the context of the conveyances between Vance, VCO, and UBS, Vance and VCO should be treated as a single entity.

131.    Vance was rendered insolvent by these conveyances.

132.    Each of the parties to these conveyances knew or should have known that Vance would incur tax liability to the United States that it would not be able to pay. To the extent that any party lacked actual knowledge, it actively avoided such knowledge, failed to conduct ordinary diligence that would have provided such knowledge, or failed to inquire in the face of circumstances that should have led to further inquiries that would have provided such knowledge.

133.    Each of the parties to these conveyances knew or should have known that these conveyances would hinder, delay, and defraud the United States. To the extent that any party lacked actual knowledge, it actively avoided such knowledge, failed to conduct ordinary diligence that would have provided such knowledge, or failed to inquire in the face of circumstances that should have led to further inquiries that would have provided such knowledge.

134.    Accordingly, pursuant to NYUFCA Sections 276 and 278, to the extent necessary to satisfy the United States' federal tax claim against Vance, the United States is entitled to judgment against all defendants (i) setting aside the conveyances; (ii) disregarding the conveyances and allowing the United States to attach or levy execution upon property conveyed; and (iii) awarding it the value of the property, including interest or appreciation, to the maximum extent allowed by law.

135.    Additionally, pursuant to NYUFCA Section 276-A, the United States is entitled to judgment awarding reasonable attorney's fees for this action.

### COUNT IV: NEW YORK TRUST FUND DOCTRINE
### (against Vance Shareholders and Subsequent Transferees)

136.    The United States repeats and realleges the allegations in paragraph 1 through 100 with the same force and effect as if set forth fully herein.

137.    Under New York's trust fund doctrine, the distributee-shareholders of a dissolved corporation's assets are liable as transferees for taxes incurred by the corporation before dissolution. *See Phillips v. Comm'r*, 42 F.2d 177 (2d Cir. 1930), *aff'd*, 283 U.S. 589 (1931).

138.    The conveyances between the Vance Shareholders and VCO, and Vance and UBS, when collapsed as a single transaction, constitute liquidating distributions from Vance to the Vance Shareholders.

139.    The Vance Shareholders received liquidating distributions from Vance totaling $65,850,000.

140.    The Vance Shareholders and directors of Vance had a duty to discharge the unpaid corporate tax liability of Vance.

141.    The liquidating distributions received by the Vance Shareholders were sufficient to satisfy the corporate income tax liability of Vance for tax year 2002.

142.    The Vance Shareholders made subsequent transfers of funds to the Subsequent Transferees, without fair consideration, and such funds should have been held in trust by the Vance Shareholders and paid to the United States.

143.    Equity and good conscience militate against permitting the Vance Shareholders and Subsequent Transferees to retain the funds necessary to pay the unpaid federal tax liability of Vance.

144.    Exhaustion of the United States' remedies at law against Vance would be futile.

145.    The Vance Shareholders and Subsequent Transferees are jointly and severally liable to the United States for taxes incurred by Vance before its dissolution. *See Rodgers v. Logan*, 121 A.D.2d 250, 253 (1st Dep't 1986).

146.    Accordingly, the United States is entitled to a judgment establishing a constructive trust against the Vance Shareholders and Subsequent Transferees in the amount of Vance's unpaid federal tax liability, including penalties and interest, for the tax year ending December 31, 2002.

## COUNT V: UNJUST ENRICHMENT
### (against Vance Shareholders and Subsequent Transferees)

147.    The United States repeats and realleges the allegations in paragraph 1 through 100 with the same force and effect as if set forth fully herein.

148.    As a result of the transactions at issue in this complaint, the Vance Shareholders and Subsequent Transferees were enriched at the expense of the United States.

149.    Equity and good conscience militate against permitting the Vance Shareholders and Subsequent Transferees to retain the funds necessary to pay the unpaid federal tax liability of Vance.

150.    Accordingly, the United States is entitled to judgment against the Vance Shareholders and Subsequent Transferees in the amount of Vance's unpaid federal tax liability, including penalties and interest, for the tax year ending December 31, 2002.

## COUNT VI: MONEY HAD AND RECEIVED
### (against Vance Shareholders and Subsequent Transferees)

151.    The United States repeats and realleges the allegations in paragraph 1 through 100 with the same force and effect as if set forth fully herein.

152.    As a result of the transactions at issue in this complaint, the Vance Shareholders and Subsequent Transferees received and retained funds that should have been paid to the United States to satisfy the unpaid federal tax liability of Vance.

153.    The Vance Shareholders and Subsequent Transferees benefited, and continue to benefit, from the receipt of funds that should have been paid to the United States.

154.    Equity and good conscience militate against permitting the Vance Shareholders and Subsequent Transferees to retain the funds necessary to pay the unpaid federal tax liability of Vance.

155.    Accordingly, the United States is entitled to judgment against the Vance Shareholders and Subsequent Transferees in the amount of Vance's unpaid federal tax liability, including penalties and interest, for the tax year ending December 31, 2002.

## REQUEST FOR RELIEF

WHEREFORE, the United States requests that the Court enter judgment as follows:

1.    As against Vance, awarding the amount of Vance's unpaid tax liability, which as of September 1, 2024, totals $80,962,623.00, plus interest and statutory additions from September 1, 2024, pursuant to 26 U.S.C. § 7402(a);

2.    As against all defendants, pursuant to NYUFCA §§ 273, 274, 275, 276, and 278, setting aside the conveyances of property (including funds) from Vance to the Vance Shareholders and their Subsequent Transferees to the extent necessary to satisfy Vance's unpaid federal tax liability with interest; allowing satisfaction of Vance's unpaid federal tax liability from the transferred property (including funds); and awarding, up to the amount of Vance's unpaid federal tax liability with interest, the value of the transferred property (including funds), including interest or appreciation, to the maximum extent allowed by law;

3.    As against all defendants, awarding fees as provided by NYUFCA § 276-A;

4.    As against the Vance Shareholders and Subsequent Transferees, awarding the amount of Vance's unpaid federal tax liability with interest on the United States' unjust enrichment claim;

5.      As against the Vance Shareholders and Subsequent Transferees, awarding the amount of Vance's unpaid federal tax liability with interest on the United States' New York trust fund doctrine claim;

6.      As against the Vance Shareholders and Subsequent Transferees, awarding the amount of Vance's unpaid federal tax liability with interest on the United States' money had and received claim;

7.      As against all defendants, ordering an accounting of all assets, including all assets that have been transferred or paid to any individual or entity;

8.      In the event that the United States is required to use any of the remedies in subchapter B or C of the Federal Debt Collection Procedures Act (28 U.S.C. §§ 3101-3206) to collect this debt, the United States will also seek to recover a 10% surcharge under 28 U.S.C. § 3011; and

9.      Awarding such further relief as is proper.


Dated:      New York, New York
            September 10, 2024

                                    DAMIAN WILLIAMS
                                    United States Attorney for the
                                    Southern District of New York


                              By:   _/s/ Jennifer Jude_____
                                    JENNIFER JUDE
                                    DAVID E. FARBER
                                    Assistant United States Attorneys
                                    86 Chambers Street, 3rd Floor
                                    New York, New York 10007
                                    Tel.: (212) 637-2800
                                    jennifer.jude@usdoj.gov
                                    david.farber@usdoj.gov

                                    *Counsel for the United States*