UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

– against –

VANCE FINANCE AND HOLDING
CORP., ANTOINETTE GUERRINI-
MARALDI, *individually, and in her
capacity as trustee of the Trust f/b/o
Antoinette Guerrini-Maraldi under Will
of Amanda Vance Storrs, and in her
capacity as trustee of the Trust f/b/o
Antoinette Guerrini-Maraldi under
Paragraph 4(a) of Agreement dated
6/30/39, modifying Article 11th of the
Will of Frank Vance Storrs, and in her
capacity as trustee of the Trust f/b/o
Antoinette Guerrini-Maraldi under
Article 11th of the Will of Frank Vance
Storrs*, MELISSA P. ROESSLER,
*individually, and in her capacity as co-
executor of the estate of Carolyn
Lucioli-Ottieri, and in her capacity as
trustee of the Melissa Roessler GST
Exempt Lifetime Trust, and in her
capacity as trustee of the Trust f/b/o
Carolyn Lucioli-Ottieri under the Will of
Amanda Vance Storrs*, GUSTAVO
ROESSLER, *individually, and in his
capacity as trustee of the Melissa
Roessler GST Exempt Lifetime Trust*,
DANIEL S. PHELAN*, individually, and
in his capacity as trustee of the Daniel
Phelan GST Exempt Lifetime Trust*,
LASZLO ADAM, *in his capacity as
trustee of the Daniel Phelan GST
Exempt Lifetime Trust*, JOHN V.
PHELAN, *individually, and in his
capacity as trustee of the John Phelan
GST Exempt Lifetime Trust, and in his
capacity as trustee of the Daniel Phelan
GST Exempt Lifetime Trust*,
KIMBERLEE PHELAN, *in her capacity*

**OPINION & ORDER**

24-cv-6846 (ER)

*as trustee of the John Phelan GST Exempt Lifetime Trust*, MICHAEL C. PHELAN, *individually, and in his capacity as trustee of the Michael Phelan GST Exempt Lifetime Trust*, TANYA L. PHELAN, *in her capacity as trustee of the Michael Phelan GST Exempt Lifetime Trust*, PIERO LUCIOLI-OTTIERI, *individually, and in his capacity as co-executor of the estate of Carolyn Lucioli-Ottieri, and in his capacity as trustee of the Trust f/b/o Carolyn Lucioli-Ottieri under Article 11th of the Will of Frank Vance Storrs, and in his capacity as trustee of the Trust f/b/o Carolyn Lucioli-Ottieri under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs*, ISABELLA SANTANGELO, ALESSANDRA LUCIOLI-OTTIERI, ALESSANDRO GUERRINI-MARALDI, *individually, and in his capacity as trustee of the Trust f/b/o Antoinette Guerrini-Maraldi under Article 11th of the Will of Frank Vance Storrs*, FILIPPO GUERRINI-MARALDI, VANESSA WILCOX, HANCOCK WHITNEY CORPORATION, *as trustee of the Trust f/b/o Carolyn Lucioli-Ottieri under Article 11th of the Will of Frank Vance Storrs, and as trustee of the Trust f/b/o Carolyn Lucioli-Ottieri under Paragraph 4(a) of Agreement dated 6/30/39, modifying Article 11th of the Will of Frank Vance Storrs*, J.P. MORGAN TRUST COMPANY OF DELAWARE, *as trustee of the Trust f/b/o Antoinette Guerrini-Maraldi under Article 11th of the Will of Frank Vance Storrs, and as trustee of the Trust f/b/o Antoinette Guerrini-Maraldi under Paragraph 4(a) of Agreement dated 6/30/1939, modifying Article 11th of the*

*Will of Frank Storrs*, and JOHN DOES
1-10,

                                        Defendants,

RAMOS, D.J.:

       The United States of America (the "Government") brings this action against

Vance Finance and Holding Corporation ("Vance") and the former shareholders of Vance

(the "Shareholders")[1] and their subsequent transferees (the "Subsequent Transferees")[2]

alleging, among other things, that they engaged in an intermediary transaction tax shelter

("Intermediary Transaction") to avoid paying federal taxes on the sale of Vance's stock.

Doc. 6.  The Government brings claims against the Shareholders and Subsequent

Transferees (together, "Defendants") for actual and constructive fraudulent conveyances

pursuant to New York Uniform Fraudulent Conveyance Act ("NYUFCA"), N.Y. Debtor

& Credit Law ("DCL") §§ 273–276, 278.  *Id.* ¶¶ 108–35.[3]  The Government also asserts

causes of actions against Defendants under New York's trust fund doctrine,[4] for unjust

enrichment, and for money had and received.  *Id.* ¶¶ 136–55.  Before the Court is

---

[1] The Shareholders are (1) Antoinette Guerrini-Maraldi, individually and as trustee, (2) Melissa Roessler, individually, and as trustee and co-executor, (3) Gustavo Roessler, (4) Daniel Phelan, (5) John Phelan, (6) Michael Phelan, (7) Piero Lucioli-Ottieri, as trustee and co-executor, (8) Alessandro Guerrini-Maraldi, as trustee, (9) Hancock Whitney Corporation, as trustee, and (10) J.P. Morgan Trust Company, as trustee. Doc. 6 at 4 n.2.

[2] The Subsequent Transferees are (1) Antoinette Guerrini-Maraldi, (2) Melissa Roessler, individually and as co-executor, (3) Gustavo Roessler, as trustee, (4) Daniel Phelan, (5) John Phelan, (6) Michael Phelan, (7) Laszlo Adam, as trustee, (8) Kimberlee Phelan, as trustee, (9) Tanya Phelan, as trustee, (10) Piero Lucioli-Ottieri, individually and as co-executor, (11) Isabella Santangelo, (12) Alessandra Lucioli-Ottieri, (13) Alessandro Guerrini-Maraldi, (14) Filippo Guerrini-Maraldi, (15) Vanessa Wilcox, and (16) John Does 1-10.  Doc. 6 at 4 n.2.

[3] On December 19, 2019, New York amended Article 10 of the DCL to replace the NYUFCA with the New York Uniform Voidable Transactions Act ("NYUVTA"), which became effective on April 4, 2020.  *See* 2019 N.Y. Laws, ch. 580.  Here, the NYUFCA still applies because the transfers at issue occurred before April 4, 2020.  *See Varbero v. Belesis*, No. 20-cv-2538 (LJL), 2020 WL 5849516, at *5 n.1 (S.D.N.Y. Oct. 1, 2020) (applying NYUFCA in case involving pre-amendment transactions).  The parties do not dispute that NYUFCA applies.  *See* Doc. 31 at 8 n.7; Doc. 39 at 11 n.1.

[4] Under the trust fund doctrine, "officers and directors of an insolvent corporation are said to hold the remaining corporate assets in trust for the benefit of its general creditors."  *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 549 (2000).

Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 30.  For the reasons set forth below, the motion is DENIED.

## I.    BACKGROUND

### A.  Factual Background[5]

#### 1.  Intermediary Transaction Tax Shelters

A taxpayer that disposes of a capital asset that has appreciated in value must pay tax on the capital gain pursuant to 26 U.S.C. §§ l(h), 1001, 1011, 1012, 1221, 1222.  Doc. 6 ¶ 27.  The capital gain is "the difference between the amount realized from the disposition of the asset and the asset's 'adjusted basis,' which is the cost originally paid by the taxpayer, subject to certain adjustments permitted by tax law."  *Id.*

Intermediary transaction tax shelters "involve corporations that typically . . . hold[] almost entirely cash or cash equivalents . . . and whose only liabilities are federal, state, and/or local taxes."  *Id.* ¶ 28.

In this type of transaction, a third party—typically a tax-shelter promoter— "agrees to purchase [a] corporation's stock . . . at a price equal to the market value of the assets . . . that the corporation owns, minus a premium which often is equal to a percentage of the corporate tax due on the capital gains of those assets."  *Id.* ¶ 29.  The tax-shelter promoter does this by "creating an intermediary entity . . . and causes it to acquire the corporate stock."  *Id.*  The tax-shelter promoter "offer[s] such a generous price for the corporate stock . . . because the parties to the transaction intend to avoid that [tax] liability improperly."  *Id.* ¶ 30.  This "avoidance is typically accomplished by offsetting the gains realized on the disposition of the assets with artificial losses generated by another tax shelter transaction."  *Id.*  "By selling their stock to [an intermediary transaction tax shelter] rather than causing the corporation to sell its assets, pay the realized tax, and distribute the remaining proceeds, the shareholders receive more than the net value of the corporation's assets because they have avoided paying corporate

---

[5] The following facts are drawn from the complaint.  *See* Doc. 6.

taxes." *Id.* ¶ 31.  Thus, this type of transaction "enable[s] [a] corporation's shareholders to realize the value of the corporation's appreciated assets without paying corporate-level taxes on the built-in gain." *Id.* ¶ 28.

These transactions allegedly "occur[] at the expense of the [Internal Revenue Service]" (the "IRS") and "amount to fraudulent conveyances that unjustly enrich the corporation's shareholders." *Id.* ¶¶ 31, 33.

### 2. *Creation of Vance and the Vance Family*

Frank Vance Storrs ("Storrs") founded Vance in 1923, which was incorporated in Delaware. *Id.* ¶ 34.  Carolyn Storrs Sickles ("Sickles"), one of Storrs' daughters, inherited most of Storrs' ownership in Vance. *Id.* ¶ 35.[6]  Sickles had three daughters:  (1) Carolyn Lucioli-Ottieri, (2) Antoinette Guerrini-Maraldi, and (3) Sondra Phelan. *Id.*[7] The three sisters had a total of 10 children. *Id.* ¶ 35 n.8– n.10.  Carolyn Lucioli-Ottieri's three children are Piero Lucioli-Ottieri, Isabella Santangelo, and Alessandra Lucioli-Ottieri. *Id.* ¶ 35 n.8.  Antoinette Guerrini-Maraldi's three children are Vanessa Wilcox, Alessandro Guerrini-Maraldi, and Filippo Guerrini-Maraldi. *Id.* ¶ 35 n.9.  Sondra Phelan's four children are John Phelan, Daniel Phelan, Michael Phelan, and Melissa Roessler. *Id.* ¶ 35 n.10.

Vance's stock was sold to an intermediary entity (the "Stock Sale") in April 2002. *Id.* ¶¶ 1, 34.  At the time, Vance was primarily an investment holding company with a portfolio of appreciated investment securities, was owned by members of Storrs' extended family, and had 17 shareholders. *Id.* ¶¶ 1, 8, 34–35.  The Shareholders, which include Storrs' descendants, a spouse of a Storrs' descendant, and corporate trustees of trusts that owned a percentage of Vance's stock, received funds directly from the sale of Vance's stock. *Id.* at 4 n.2.  The Subsequent Transferees received subsequent transfers from the Shareholders. *Id.*

---

[6] The complaint does not specify when Sickles inherited Storrs' ownership in Vance.  *See* Doc. 6.

[7] Sondra Phelan died in 1999.  Doc. 6 ¶ 35 n.10.

Prior to the Stock Sale, Vance was managed by Demitrio Guerrini-Maraldi, Antoinette Guerrini-Maraldi's husband, and James Phelan, Sondra Phelan's husband. *Id.* ¶ 36. Demitrio Guerrini-Maraldi and James Phelan were Vance's president and vice president, respectively. *Id.*

### 3. The Sale of Vance

The younger generations of Storrs' descendants became concerned about Vance's future in 1999 because Demitrio Guerrini-Maraldi and James Phelan were approaching retirement age and had health issues. *Id.* ¶ 38.[8] The Shareholders concluded that no other family member could manage Vance. *Id.*

The Shareholders asked Brauner Baron Rosenzweig & Klein LLP ("Brauner Baron"), Vance's law firm, to explore different structures to "unlock[] shareholder value" in late 1999 or early 2000. *Id.* ¶ 39. The primary attorneys at Brauner Baron on the Vance account were Christopher Schwabacher and Charles Damato. *Id.* Brauner Baron engaged Roberts & Holland LLP, a law firm with tax expertise, to assist with developing strategies to explore the future of Vance. *Id.*

Brauner Baron and Roberts & Holland prepared a memorandum in November 2000 for the Shareholders summarizing four alternatives that would achieve the goal of eliminating the double taxation that would result from Vance being a "C" corporation ("C Corp")[9]: (1) subchapter S election,[10] (2) freeze transactions, (3) corporate amalgamation, and (4) discounted cash sale. *Id.* ¶ 40.

---

[8] Demitrio Guerrini-Maraldi died in 2002, and James Phelan died in 2012. Doc. 6 ¶ 37.

[9] According to the memorandum, a C Corp is "taxable under the classic system of corporate double taxation: the corporation is taxable on its earnings and the shareholders are taxed on distributions to them of those earnings, in full and at ordinary income rates." Doc. 6 ¶ 40 n.12.

[10] "Subchapter S allows shareholders of qualified corporations to elect a 'pass-through' taxation system under which income is subjected to only one level of taxation … The corporation's profits pass through directly to its shareholders on a pro rata basis and are reported on the shareholders' individual tax returns." *Gitlitz v. Commissioner*, 531 U.S. 206, 209 (2001) (citations omitted).

Roberts & Holland recommended to Brauner Baron to include the first three options.  *Id.* ¶ 41.  The fourth option, the discounted sale option, was added because James Phelan told Brauner Baron that Vance wanted to consider a stock sale.  *Id.*

Also in November 2000, a special committee, composed of the Shareholders or their family members, was established to explore and make recommendations on Vance's future ("Special Committee").  *Id.* ¶ 42.  The Special Committee consisted of John Wilcox, Gustavo Roessler, Piero Lucioli-Ottieri, Alessandro Guerrini-Maraldi, and Kimberlee Phelan ("Special Committee members").  *Id.*[11]

On February 26, 2001, as the Special Committee was exploring its options, the IRS published IRS Notice 2001-16 ("Notice 2001-16"), which announced that the IRS "intend[ed] to challenge the purported tax results of intermediary tax shelters."  *Id.* ¶¶ 33, 59.[12]

---

[11] Each of these individuals had substantial experience with sophisticated corporate transactions.  Doc. 6 ¶ 42.

At the time of the Stock Sale, Kimberlee Phelan worked at an accounting firm, Withum Smith+Brown, and previously worked at Coopers & Lybrand LLP and Price Waterhouse LLP.  *Id.* ¶ 43.  Her professional expertise was in federal and international taxation, and she worked on behalf of individuals and corporations.  *Id.*  She graduated from Wellesley College with a degree in economics and international relations, earned a Master's in Business Administration in accounting and finance from the University of California, Los Angeles, and was a member of the American Institute of Certified Public Accountants.  *Id.*  She obtained her Certified Public Accountant license in 1993.  *Id.*

At the time of the Stock Sale, John Wilcox was the chairman of Georgeson & Company, a proxy and investor relations firm.  *Id.* ¶ 44.  He graduated from Harvard College, and received a Master's in English from the University of California, Berkeley, a Juris Doctor from Harvard Law School, and a Master of Laws in Corporate Law from New York University.  *Id.*

At the time of the IRS's audit into Vance's 2002 tax return, Gustavo Roessler was a financial advisor employed with Morgan Stanley with over 25 years of experience, a registered Investment Advisor with the Securities and Exchange Commission, and a registered broker with the Financial Industry Regulatory Authority ("FINRA"), and he held Series 7, 24, 31 and 66 licenses from FINRA.  *Id.* ¶ 45.

[12] Notice 2001-16 set forth that certain intermediary transactions are listed transactions, which are reportable transactions that are subject to disclosure requirements to the IRS.  26 C.F.R. § 1.6011-4.  26 U.S.C.A. § 6707A provides that "[a] person who fails to include on any return or statement any information with respect to a reportable transaction which is required under section 6011 to be included with such return or statement shall pay a penalty."

On June 4, 2001, at the annual Vance shareholder meeting in New York, the Special Committee presented four alternatives regarding Vance's future: (1) status quo, (2) freeze transaction, (3) liquidation, and (4) sale. *Id.* ¶ 47.[13] As to the fourth option, the minutes note, "[t]he sale would … produce $52.7 million in proceeds which is considerably greater than $40.5 million which would be generated by liquidation." *Id.* ¶ 48. Carolyn Lucioli-Ottieri made a motion to sell Vance's stock. *Id.* ¶ 50. James Phelan seconded the motion and all the shareholders except Chase Bank[14] unanimously approved it. *Id.*

At the meeting, Gustavo Roessler, a Special Committee member, suggested indemnifying the Special Committee members for their work, and the Shareholders agreed that a standard form of indemnification should be provided to the Special Committee members. *Id.* ¶ 52.

Kimberlee Phelan was tasked with soliciting potential buyers of Vance's stock and sent letters to three entities—the Diversified Group ("Diversified"),[15] Value Financial Statutory Trust, and Fortrend International—by the Special Committee. *Id.* ¶¶ 53–56. All three potential buyers were allegedly tax-shelter promoters. *Id.* ¶ 53.

John Wilcox recalled that he learned about Diversified through his wife's cousin. *Id.*

---

[13] At that meeting, the Shareholders and relatives of the Shareholders in attendance were (1) Alessandro Guerrini-Maraldi, (2) Antoinette Guerrini-Maraldi, (3) Demetrio Guerrini-Maraldi, (4) Carolyn Lucioli-Ottieri, (5) Piero Lucioli-Ottieri, (6) Daniel Phelan, (7) James Phelan, (8) John Phelan, (9) Kimberlee Phelan, (10) Michael Phelan, (11) Gustavo Roessler, (12) Melissa Roessler, (13) Derek Schuster, (14) John Wilcox, and (15) Vanessa Wilcox. Doc. 6 ¶ 47 n.13.

[14] Chase Bank, a trustee for certain of the shareholder trusts, abstained from the vote. Doc. 6 ¶ 50.

[15] As the Government points out, prior to the solicitation of Diversified, on March 22, 2001, Judge Shira Scheindlin of the Southern District of New York issued an opinion in *Diversified Group, Inc. v. Daugerdas*, 139 F. Supp. 2d 445 (S.D.N.Y. 2001), which granted in part motions for summary judgment and described Diversified as a firm "in the business of conceiving and marketing products and methods designed to help taxpayers minimize their corporate and/or personal income taxes," whose business included "developing tax strategies and using them in transactions meeting clients' particular business and investment objectives," *id.* at 448. In the complaint, the Government alleges that "[t]his opinion [] describes the same 'tax strategy' developed by Diversified that was utilized to create the artificial tax losses in connection with the Intermediary Transaction." Doc. 6 ¶ 59.

On November 7, 2001, Diversified sent a letter of intent offering a cash purchase price, equal to the market value of the assets, less 5.5% of the unrealized capital gains, for all of Vance's stock.  *Id.* ¶ 54.  Diversified stated that it expected to finance some or all of the purchase price, but that the closing would not be subject to a financing contingency. *Id.*  Handwritten changes on the letter indicated that the 5.5% offer was reduced to 5%. *Id.*  Diversified's offer resulted in a purchase price of $65.35 million.  *Id.*

On November 16, 2001, Value Financial Statutory Trust presented a proposal to acquire all of Vance's outstanding stock for 92.0% of the fair market value of Vance's assets less the amount of Vance's liabilities.  *Id.* ¶ 55.  Value Financial Statutory Trust's offer resulted in a purchase price of $62.56 million.  *Id.*

Also, on November 16, 2001, Fortrend International presented a plan to acquire all of Vance's stock through a different company, Silver Dawn, Inc. ("Silver").  *Id.* ¶ 56. The purchase price was to be paid in cash, which Silver planned to finance through Rabobank Nederlands in New York.  *Id.*  Fortrend International's offer resulted in a purchase price of $64.42 million.  *Id.*

Vance accepted Diversified's offer.  *Id.* ¶ 58.  The communications with Diversified were primarily handled by Brauner Baron, who communicated with Diversified's chief financial officer, John Huber ("Huber"), and its president and founder, James Haber ("Haber"), and with Diversified's attorneys.  *Id.*

Diversified set up an intermediary entity, VCO Acquisition Ltd. ("VCO"), to purchase Vance's stock.  *Id.* ¶¶ 60, 66.  VCO was formed on April 2, 2002.  *Id.* ¶ 66.

The Stock Sale took place on April 5, 2002.  *Id.* ¶ 67.  At the time of the Stock Sale, Vance's primary assets were $9.1 million in cash and a portfolio of marketable securities with a fair market value of approximately $59 million and a tax basis of $15.3 million.  *Id.* ¶ 1.  VCO paid the $65,850,000 purchase price for the shares of Vance to the Shareholders.  *Id.* ¶ 81.

The Stock Sale was effectuated via a Stock Purchase Agreement ("SPA") executed by the Shareholders, as the sellers, and VCO, as the buyer. *Id.* ¶ 67.[16]  The SPA was signed by Haber as the Manager of VCO. *Id.* ¶ 74.  Antoinette Guerrini-Maraldi, Vanessa Wilcox, and Melissa Roessler were named as agents and representatives of the Shareholders. *Id.*

The SPA included a partial redemption of Vance's shares to dispose of Vance's other, tangible assets that were not cash and markable securities. *Id.* ¶ 68.  These assets were transferred from Vance to V Holding Company, LLC, an LLC owned by the Shareholders that was subsequently dissolved approximately one or two years after the Stock Sale. *Id.*

The SPA also required VCO to prepare and file tax returns for tax periods ending after the closing date and was to pay any taxes owed for such tax periods, as well as to indemnify the Shareholders for any taxes owed by Vance. *Id.* ¶ 73.

In preparation for the sale of Vance's stock to VCO, on April 5, 2002, Vance's portfolio of securities was transferred from Wilmington Trust Company to a UBS PaineWebber ("UBS") account (the "UBS Account"). *Id.* ¶ 70.  The UBS Account statement for April 2002 shows cash deposits of approximately $9.1 million and securities transferred in with a value of approximately $59 million delivered on April 5, 2002. *Id.*

VCO acquired all 11,109.28 of Vance's issued and outstanding shares that remained for $66,100,000, or $5,949.98 per share. *Id.* ¶ 71.  The aggregate purchase

---

[16] Defendants attached a copy of the SPA to their memorandum of law in support of their motion to dismiss. *See* Doc. 31-1.  In reviewing a motion to dismiss, a court "may consider documents that are attached to the complaint, incorporated in it by reference, integral to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (internal quotation marks and citation omitted).  "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents …. [and] [t]o be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." *Benny v. City of Long Beach*, No. 20-cv-1908 (KAM), 2021 WL 4340789, at *10 (E.D.N.Y. Sept. 23, 2021) (citations omitted).  Here, the Court will consider the SPA because it is incorporated by reference and integral to the complaint.

price, minus a $250,000 escrow amount, was to be paid in cash by wire transfer to the Shareholders. *Id.*

VCO took out a short-term loan, fully secured by Vance's assets, in order to purchase Vance's stock. *Id.* ¶ 77. The assets of Vance were liquidated, and the loan was repaid in full immediately following the purchase. *Id.*

Between April 10 and 21, 2002, the specific amounts of the sale proceeds for the Vance's securities were finalized with Vance receiving $59,251,669 in net sales proceeds after deducting all fees and expenses. *Id.* ¶ 80.

On April 10, 2002, the promoters set up two entities, VCO Investments LLC ("VCO Investments") and VCO Trading LLC ("VCO Trading"). *Id.* ¶ 84.[17] Vance was the sole member of VCO Trading, making a $25,000 capital contribution upon its formation, and later assigned its interest in VCO Trading to VCO Investments in exchange for an interest in VCO Investments. *Id.*

On April 12, 2002, Vance, through VCO Trading, simultaneously purchased from and sold to Refco Capital Markets, Ltd. ("Refco") paired European-style digital options[18] on the S&P 500 Index that were "almost completely offsetting." *Id.*[19]

The two sets of paired options Vance entered into through VCO Trading and VCO Investments allegedly provided no potential for Vance to realize material profits or losses. *Id.* ¶ 85. For tax purposes, Vance recognized the cost of the purchased options through VCO Trading and VCO Investments as a loss of $48,938,329, but did not

---

[17] The complaint does not specify who the promoters are, but the Court assumes that it was Diversified.

[18] The complaint explains that "[t]here are two basic types of options—American and European. A European option can be exercised only at maturity. An American option can be exercised anytime during the life of the option. A digital option has only two possible outcomes at expiration: some fixed payoff amount or nothing. Digital options are typically also European-style options, which means that they can be exercised only on the option's expiration date." Doc. 6 ¶ 84 n.21 (quoting *BCP Trading & Investments, LLC v. Commissioner*, 114 T.C.M. (CCH) 151 (T.C. 2017), *aff'd*, 991 F.3d 1253 (D.C. Cir. 2021)).

[19] The complaint alleges that "[t]he strike price for these paired options was nearly identical—$1,161.07 for the short position, and $1,161.04 for the long position—such that VCO Trading would neither gain nor lose any appreciable amount upon the exercising of the pair of options." Doc. 6 ¶ 84 n.22.

recognize the income from the offsetting options it sold through those entities. *Id.* ¶¶ 83, 85. This series of loss-generating transactions is known as a Son-of-BOSS tax shelter. *Id.* ¶ 85.[20] Vance realized a substantial income tax liability on the sale of its marketable securities portfolio and other assets, which was offset by the Son-of-BOSS tax shelter. *Id.* ¶¶ 1, 83.

At the time of the Stock Sale, neither the Shareholders nor Brauner Baron knew who owned or managed VCO. *Id.* ¶ 60. Neither Kimberlee Phelan nor John Wilcox conducted due diligence personally, and the Special Committee members had no personal knowledge as to whether Vance's lawyers conducted additional due diligence in connection with the Stock Sale. *Id.* ¶ 61.

Damato and Christopher Chin, the two Brauner Baron attorneys, did not conduct due diligence on Diversified, including who owned or managed Diversified. *Id.* ¶¶ 62, 64. Damato testified that at the time of the Stock Sale, he did not know how Diversified or VCO obtained the money to purchase the stock. *Id.* ¶ 62.[21] Damato further testified that the Stock Sale transaction was different from the other transactions that Brauner Baron had previously worked on in that the sale amount was very high and the

---

[20] The complaint includes the following regarding Son-of-BOSS tax shelters:

> While there are different varieties of Son-of-BOSS deals, what they have in common is the transfer of assets encumbered by significant liabilities to a partnership with the goal of inflating [the] basis in that partnership or its assets. The liabilities are usually options of some sort, and always include at least one that seems contingent at the time of transfer. Taxpayers who engage in these deals claim that this allows the partner to ignore those liabilities in computing his basis, which allows the partnership to ignore them in computing its basis. The result is that the partners will have bases high enough to provide for large noneconomic losses on their individual tax returns." *Greenberg v. Comm'r*, 115 T.C.M. (CCH) 1403 (2018), *aff'd*, 10 F.4th 1136 (11th Cir. 2021), and *aff'd*, No. 20-73023, 2021 WL 5985581 (9th Cir. Dec. 17, 2021); *see also NPR Invs., LLC ex rel. Roach v. United States*, 740 F.3d 998, 1001 (5th Cir. 2014) ("Courts, including our court and the district court in this case, have described a Son-of-BOSS transaction as a well-recognized abusive tax shelter. Artificial losses are generated for tax deduction purposes." (internal quotations and citations omitted)); *Markell Co. v. Comm'r*, 107 T.C.M. (CCH) 1447 (2014) (sustaining disallowance of the "giant loss" generated by Son-of-BOSS transaction involving [] Haber).

Doc. 6 ¶ 85 n.24.

[21] The complaint does not specify when Damato testified or in what proceeding. *See* Doc. 6 ¶¶ 62–63.

representations and warranties were less extensive than usual. *Id.*[22] Brauner Baron asked Roberts & Holland whether additional due diligence should be done to ascertain whether the buyer had losses, and Roberts & Holland indicated additional due diligence was not needed. *Id.* ¶ 65.

Damato testified that he believed that James Phelan told him that Diversified had some position that had losses that might be utilized to offset the taxable gains. *Id.* ¶ 63.

At the time of the Stock Sale, because of Notice 2001-16, the IRS required taxpayers that participated, directly or indirectly, in intermediary transaction tax shelters to report these transactions to the IRS. *Id.* ¶¶ 33, 87; *see* 26 C.F.R. § 1.6011-4T.[23]

### 4. *2002 Tax Return & Subsequent U.S. Tax Court Case*

On September 16, 2003, Vance filed its corporate income tax return for 2002 ("2002 tax return") with the IRS. Doc. 6 ¶ 91. The 2002 tax return reported (1) a long-term capital gain from the Stock Sale, (2) a total sales price of $63,680,294 with a corresponding basis of $15,347,058, for a net long-term gain of $48,333,236, and (3) a $48,938,329 short-term capital loss as a result of the paired options transactions. *Id.* ¶ 86. Accordingly, because Vance reported an overall capital loss of $605,093, Vance indicated that it was entitled to a tax refund. *Id.*

Neither Vance nor the Shareholders registered or reported the Intermediary Transaction on the 2002 tax return. *Id.* ¶ 87. The Intermediary Transaction allegedly resulted in the Shareholders realizing an estimated federal tax savings of $12,904,973 compared to what they would have paid had Vance sold its stock portfolio itself and then liquidated the corporation after paying the tax due on the asset sale. *Id.* ¶ 90. In addition,

---

[22] In their reply, Defendants attached a portion of Charles Damato's testimony. *See* Doc. 44-1. Here, the Court will not consider the testimony because it is inappropriate to consider new evidence submitted in reply on a motion to dismiss. *See D'Iorio v. Winebow, Inc.*, 920 F. Supp. 2d 313, 325 (E.D.N.Y. 2013) ("Although the Defendant attaches exhibits to its reply papers in an attempt to counter the Plaintiff's allegations, such evidence is inappropriate for consideration by this Court on a motion to dismiss.") (citations omitted). In addition, the referenced testimony is included in the complaint, and Defendants did not address the allegation in their memorandum of law in support of their motion to dismiss.

[23] 26 C.F.R. § 1.6011-4T is now codified at 26 C.F.R. § 1.6011-4.

VCO depleted its assets and Vance's assets, so neither entity would be able to pay any tax obligations once the IRS disallowed the loss generated by the Son-of-BOSS transactions.  *Id.* ¶ 89.

The IRS audited the 2002 tax return and disallowed the entirety of the $48,938,329 in claimed short-term capital losses.  *Id.* ¶¶ 2, 91.  By the time IRS disallowed the losses, the taxes owed could not be collected from Vance because its assets had been transferred to the Shareholders.  *Id.* ¶ 2.

On May 31, 2006, Vance consented to extend the statute of limitations in the assessment of the 2002 tax return until December 31, 2007.  *Id.* ¶ 91.

On December 27, 2007, the IRS issued Vance a statutory notice of deficiency ("Notice of Deficiency") for an income tax deficiency of $16,490,362 plus an underpayment penalty of $6,776,144 pursuant to 26 U.S.C. § 6662(h).  *Id.*

On March 25, 2008, Vance petitioned the U.S. Tax Court to challenge the Notice of Deficiency.  *Id.* ¶ 92.

Six years later, on April 22, 2014, the U.S. Tax Court issued an order and decision upholding the full deficiency and penalty in the Notice of Deficiency.  *Id.*

The U.S. Tax Court's order and decision became final on July 21, 2014, ninety days after it was issued.  *Id.*

On January 6, 2015, the IRS issued a notice of intent to levy, notice of federal tax lien, and collection due process ("CDP") notice to Vance, and filed a notice federal tax lien (the "2015 IRS Action").  *Id.* ¶ 94.

On March 18, 2015, Vance requested a CDP hearing, and on June 1, 2015, Vance filed a doubt as to collectability offer in compromise ("OIC"), in which it indicated that the IRS should accept a small amount in satisfaction of its liability because Vance had no assets to pay.  *Id.*  Vance offered to pay the IRS $1,000 for satisfaction of its liabilities and that of its transferees.  *Id.*  Vance paid $200 when it submitted the OIC and proposed

that it would pay the remaining $800 within one month of the IRS' acceptance of its proposal. *Id.*

On October 6, 2016, the IRS Appeals Office issued a CDP notice of determination to Vance sustaining the notice of federal tax lien and the proposed levy action, and rejecting Vance's OIC. *Id.*

On November 3, 2016, Vance petitioned the U.S. Tax Court to dispute the CDP notice of determination. *Id.* ¶ 95.

Approximately six years later, on December 7, 2022, the U.S. Tax Court sustained the CDP notice of determination. *Id.* The U.S. Tax Court also held that (1) "the [IRS] settlement officer [who was assigned the 2015 IRS Action] verified that the requirements of applicable law and procedure were met," (2) "the [IRS] settlement officer balanced the government's need for efficient tax collection with the taxpayer's legitimate concern that the collection action be no more intrusive than necessary," and (3) "the [IRS] settlement officer did not abuse his discretion in rejecting petitioner's OIC." *Vance Finance & Holding Corp. v. Commissioner*, No. 23761-16L, Doc. 48 (T.C. Dec.7, 2022). The U.S. Tax Court further clarified this determination in an order on January 10, 2023. *Id.* ¶ 95.

On March 2, 2023, Vance appealed this determination to the U.S. Court of Appeals for the Second Circuit, which has not yet decided the appeal. *Id.*

The Government alleges that Vance and Defendants improperly avoided paying more than $16.9 million in federal income taxes through the Intermediary Transaction. *Id.* ¶ 2. As of September 1, 2024, with the addition of statutory interest and penalties, the tax liability amounts to more than $80,962,623.00. *Id.* ¶ 2 n.1.

### B. Procedural History

On September 10, 2024, the Government filed the instant complaint against Vance and Defendants, alleging, among other things, that they engaged in an intermediary transaction tax shelter to avoid paying federal taxes on the sale of Vance's

stock.  Doc. 1.  The Government brings claims for actual and constructive fraudulent conveyances pursuant to NYUFCA.  Doc. 6 ¶¶ 108–35.  The Government also asserts causes of action under New York's trust fund doctrine, for unjust enrichment, and for money had and received.  *Id.* ¶¶ 136–55.  The complaint seeks (1) a judgment against Vance awarding the Government the amount of Vance's unpaid federal tax liability and (2) "to impose transferee liability for that debt on [Defendants], who are the beneficiaries of the scheme, by holding them liable for, among other things, their fraudulent conveyances."  *Id.* ¶ 3.

On September 16, 2024, the Government requested leave to file a corrected complaint to add the names of the trusts, which were previously provided only in the body of the complaint.  Doc. 4.  The Court granted the request, and on September 19, 2024, the Government filed the corrected complaint.  Docs. 5, 6.

On February 27, 2025, Defendants filed a motion to dismiss for failure to state a claim.  Doc. 30.  As to the actual and constructive fraudulent conveyance claims against the Shareholders, Defendants argue that the claims fail because the Government seeks to collapse multiple and separate transactions, handled by unrelated parties.  Doc. 31 at 8.  As to the New York's trust fund doctrine claim against the Shareholders, Defendants argue that there is no authority that would establish the Government as a creditor of Vance when its assets were sold.  *Id.* at 13–14.  As to the unjust enrichment claim against the Shareholders, Defendants argue that the Government has not shown that it provided a benefit to the Shareholders.  *Id.* at 15.  As to the money had and received claim against the Shareholders, Defendants argue that the Government has not pled some possessory interest in the specific transfers.  *Id.* at 16.  As to the actual and constructive fraudulent conveyance claims against the Subsequent Transferees, Defendants argue that the Government does not address their liability aside from just concluding that they are liable, and as to the other three claims, Defendants argue that the Government does

explain how they were unjustly enriched and did not attempt to establish its entitlement to constructive trust. *Id.* at 17; Doc. 44 at 12.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  However, this "flexible plausibility standard" is not a heightened pleading standard.  *In re Elevator Antitrust Litigation*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted).  And "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted).  Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir.

2014).  In considering a Rule 12(b)(6) motion, a district court may also consider

"documents attached to the complaint as exhibits[] and documents incorporated by

reference in the complaint."  *Doe v. New York University*, No. 20-cv-1343 (GHW), 2021

WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (quoting *DiFolco v. MSNBC Cable LLC*,

622 F.3d 104, 111 (2d Cir. 2010)).

## III.    DISCUSSION

### A.  Claims Against the Shareholders

#### 1.  *Actual Fraudulent Conveyance Claim*[24]

NYUFCA § 276 provides that:  "[e]very conveyance made and every obligation

incurred with actual intent, as distinguished from intent presumed in law, to hinder,

delay, or defraud either present or future creditors, is fraudulent as to both present and

future creditors."  A "[c]onveyance includes every payment of money, assignment,

release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also

the creation of any lien or incumbrance."  NYUFCA § 270 (internal quotation marks

omitted).  In order to make out a claim under NYUFCA § 276 for actual fraudulent

conveyance, a party must meet Fed. R. Civ. P. 9(b)'s heightened standard by pleading,

with particularity, an actual intent to defraud.  *See S.E.C. v. McGinn, Smith & Co.*, No.

1:10-cv-457 (GLS) (DRH), 2011 WL 1770472, at *3 (N.D.N.Y. May 9, 2011) (citations

omitted).

Defendants argue that the Government fails to allege an actual fraudulent

conveyance claim because it "seeks to collapse multiple and separate transactions,

undertaken by unrelated parties, into one, in order to create the appearance of a

---

[24] The Government argues that Defendants' "concession that Diversified committed an actual fraud against
the Government as part of the Intermediary Transaction is enough to reject their motion to dismiss the
Government's fraudulent conveyance claims."  Doc. 39 at 12.  In response, Defendants explain that they
"did not and could not have conceded to Diversified's fraud" and that the Government ignores Defendants'
explicit statement in their memorandum that they "lack personal knowledge of, and deny, many of the
allegations in the Complaint as those allegations concern actions taken by Diversified without
[Defendants'] knowledge or consent.  This memorandum assumes these facts are true solely for the purpose
of this motion and should not be treated as a waiver of any argument on the truth of an asserted fact."  Doc.
44 at 3–4; *see* Doc. 31 at 4 n.3.

conveyance from Vance to the [Shareholders]." Doc. 31 at 8. Defendants note that the "[c]omplaint does not allege facts supporting the conclusion that the [Shareholders] knew or should have known that their stock sale was the start of a complex tax avoidance effort by Diversified." *Id.* at 10.

"It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the [NY]UFCA." *Diebold Foundation, Inc. v. Commissioner of Internal Revenue*, 736 F.3d 172, 186 (2d Cir. 2013) (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995)). "Such a transaction can be collapsed if two elements are met. First, in accordance with the foregoing paradigm, the consideration received from the first transferee must be reconveyed by the [party owing the liability] for less than fair consideration or with an actual intent to defraud creditors. Second, . . . the transferee in the leg of the transaction sought to be voided must have actual or constructive knowledge of the entire scheme that renders her exchange with the debtor fraudulent." *Id.* (internal quotation marks and citations omitted).

Here, the Court finds that the transactions in April 2002 are appropriately collapsed because the Government alleges both elements in order to consider the separate phases as one transaction. The Government sufficiently alleges that when the transactions in April 2002 "are appropriately collapsed, the [] Shareholders made conveyances with actual intent to defraud the Government." Doc. 39 at 14; *see* NYUFCA § 276. Specifically, the Government alleges that: (1) the transactions in April 2002 "were for less than fair consideration"; (2) the Shareholders "had constructive knowledge of the entire fraudulent Intermediary Transaction scheme"; and (3) the Shareholders "had actual intent to defraud the Government." *Id.* at 15.

    *a. Transactions Were for Less Than Fair Consideration*

Here, the Government alleges that the transactions were for less than fair consideration by alleging: (1) "VCO overpaid the [] Shareholders because the purchase

price for Vance's shares ($66.1 million) did not take into account the built-in capital gains tax liability, totaling over $16.4 million;" and (2) "VCO's immediate sale of all of Vance's marketable securities, and repayment of the loan from the Rabobank subsidiary used to pay the Shareholders, left Vance without sufficient funds to cover that capital gains tax liability." *Id.*; *see* Doc. 6 ¶¶ 54, 71, 81–83, 86, 88–89. Thus, "there was no[] fair consideration because the sellers received virtually full market value for assets which, when sold, triggered a massive, embedded, tax liability." *Dillon Trust Co. LLC v. United States*, 168 Fed. Cl. 228, 251 (2023).[25] In addition, although VCO was "an additional party who serve[d] as the conduit for transfers" for the Intermediary Transaction, VCO's role does not alter the analysis that the transactions in April 2002 were for less than fair consideration. *See Diebold*, 736 F.3d at 186–87.

### b. *Constructive Knowledge of the Fraudulent Scheme*[26]

"Concluding that a party had constructive knowledge does not require a showing that the party had actual knowledge of a scheme; rather, it is sufficient if, based upon the surrounding circumstances, they 'should have known' about the entire scheme." *Id.* at 187 (citing *HBE Leasing*, 48 F.3d at 636). "Constructive knowledge is either the 'knowledge that ordinary diligence would have elicited' or a 'more active avoidance of the truth.'" *Alterman v. Commissioner of Internal Revenue*, 110 T.C.M. (CCH) 507 (T.C. 2015).[27] For purposes of constructive knowledge, "it is sufficient if either of two

---

[25] As the Government points out, "[i]n *Dillon Trust*, the Court of Federal Claims dealt with a nearly identical intermediary transaction tax shelter promoted by [] Haber in which several family trusts sold stock in a corporation holding marketable securities to a Haber-controlled entity, while avoiding built-in capital gains tax liabilities … After a bench trial, the court found that the IRS had successfully shown that the family trusts were liable for the corporation's tax liabilities as transferees under the NYUFCA." Doc. 39 at 13 n.3 (citations omitted).

[26] Although the Court determined that the SPA is incorporated by reference, the Court will not consider the affirmative defense that the Shareholders "lacked knowledge of the fraud [] based on their purported reliance on representations and warranties in the SPA" because "such a defense cannot be considered at the motion to dismiss stage." Doc. 39 at 14 (citing *In re Dreier LLP*, 452 B.R. 391, 434 (Bankr. S.D.N.Y. 2011)).

[27] "Courts that have applied a constructive knowledge … test have also differed as to just how that test is to be applied." *In re Direct Access Partners*, LLC, 602 B.R. 495, 551 (Bankr. S.D.N.Y. 2019) (internal quotation marks omitted). "The Second Circuit Court of Appeals summarized these different approaches in

scenarios are [alleged]": (1) "the plaintiffs were on inquiry notice of the general outline of Haber's scheme—buy the corporate stock, sell the assets of the companies and then not pay the taxes—and yet they proceeded with the sale," *or* (2) "there were indicators of the potential for fraud and yet they deliberately chose to remain ignorant of what further inquiry might reveal." *Dillon Trust*, 168 Fed. Cl. at 253.

Here, the Court finds that the Government sufficiently alleges that the Shareholders had constructive knowledge of the entire fraudulent scheme to collapse the transactions in April 2002, meeting either version of the constructive knowledge test. As to inquiry notice, the Government alleges that the Shareholders "chose to engage in the [I]ntermediary [T]ransaction scheme because it would provide a 'greater return'—*i.e.*, selling Vance's stock to Diversified would avoid the tax liability arising from the built-in capital gains if the underlying securities held by Vance were simply sold on the market." Doc. 39 at 16; *see* Doc. 6 ¶ 51; *see also Diebold*, 736 F.3d at 188 ("[I]t is of great import [to the inquiry notice] that the [s]hareholders recognized the 'problem' of the tax liability arising from the built-in gains on the assets."). Here, the Shareholders "specifically sought out parties that could help them avoid the tax liability inherent in a C Corp holding appreciated assets." *Diebold*, 736 F.3d at 188. In addition, prior to entering into the Intermediary Transaction with Diversified, the Shareholders were advised by the Special Committee—which included members that "had significant experience with sophisticated corporate transactions based on their professional background"—and two law firms, Brauner Baron and Roberts & Holland. Doc. 6 ¶¶ 39–45, 47–49; *see id.* ("The parties to this transaction were extremely sophisticated actors, deploying a stable of tax attorneys"). In fact, the Shareholders' lawyer, Damato, admitted that "the Stock Sale transaction was different from the other transactions that Brauner Baron had previously

---

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d. Cir. 1995), observing that there was some ambiguity as to the precise test for constructive knowledge, as some courts had held that transferees who failed to make inquiry were charged with the knowledge that ordinary diligence would have elicited, while others had required a more active avoidance of the truth." *Id.* (internal quotation marks and citation omitted).

worked on in that the sale amount was very high and the representations and warranties were less extensive than usual." *Id.* ¶ 62.  The Government further alleges that Diversified's proposal was "to buy Vance's stock for the value of its [underlying] assets—ignoring the large [built-in] capital gains tax liability—in exchange for a fee equal to a small fraction of that liability." *Id.* ¶ 54; *see Dillon Trust*, 168 Fed. Cl. at 258 ("It made no economic sense for two bidders to show up offering prices at virtually full value of the underlying assets.  There was no mystery here in this regard other than that created by plaintiffs' own desire to remain ignorant, or to feign ignorance.").

The Government also alleges that the Shareholders "remained willfully ignorant of Haber's tax shelter scheme by failing to conduct *any* due diligence into [] Haber or VCO . . . let alone to determine whether it had offsetting losses or what it intended to do with the portfolio of marketable securities it was purchasing."  Doc. 39 at 17–18; *see* Doc. 6 ¶¶ 60–65; *see also Dillon Trust*, 168 Fed. Cl. at 260 ("At a bare minimum, there were plenty of indicators of the possibility of fraud that plaintiffs were on inquiry notice to go further and attempt to assure themselves that Haber was not planning to sell the assets quickly and that he had the means to absorb the tax liability if he did . . . Plaintiffs clearly did not want to know the facts about [the entity formed by Haber to buy the stock] because that would have jeopardized their ability to accept an unrealistic bid for the corporate stock.").

   c.  *Actual Intent to Defraud the Government*

"The Second Circuit has found that an inference of fraudulent intent 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or, (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  *In re Refco Securities Litigation*, 759 F. Supp. 2d 301, 315 (S.D.N.Y. 2010) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).  "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.

Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130. "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *In re Sharp International Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (quoting *Wall Street Associates v. Brodsky*, 684 N.Y.S.2d 244, 247 (1st Dep't 1999)). These include "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance." *Refco Group Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13-cv-1654 (RA), 2014 WL 2610608, at *43 (S.D.N.Y. June 10, 2014) (quoting *Wall Street Associates*, 684 N.Y.S.2d at 248)).

Here, the Government sufficiently pleads that the Shareholders had both the motive and opportunity to commit fraud. The Government alleges that, in 1999, the Shareholders "considered selling their entire portfolio of investment securities, but also sought information about other methods of maximizing the value of Vance." Doc. 6 ¶ 38. The Shareholders allegedly voted and approved to sell Vance's stock and shortly after, the Special Committee sent out request letters to three potential buyers, who the Government alleges were all tax shelter promoters. *Id.* ¶¶ 50, 53. The Shareholders allegedly decided against a liquidation option because (1) "there was a greater return" to them if they could find a company to buy the "stock rather than liquidate the portfolio," and (2) they would only need to report "the capital gain on the sale of [the] stock" and "all of [the] capital gains would remain with the corporation" unlike the liquidation option, which would have required Vance to "pay corporate-level tax on the capital in its assets[] and then that dividend would be double-taxed at the shareholder level." *Id.* ¶ 51. Vance accepted the offer from Diversified, which was the highest bidder. *Id.* ¶ 58.

The Government also alleges several badges of fraud that give rise to an inference of intent, including (1) a lack of fair consideration, (2) a close relationship between the transferor, Vance, and the transferees, the Shareholders, (3) a questionable transaction not in the ordinary course of business, and (4) the financial condition of the parties after the transaction. First, as previously discussed, the Government alleges that there was a lack of fair consideration. *See id.* ¶¶ 54, 81–83, 86, 88–89. Second, the Government alleges a close relationship between Vance and the Shareholders. *See id.* ¶¶ 34–38, 42, 74–75. Third, the Government alleges that the Shareholders engaged in a questionable transaction not in the ordinary course of business. *See id.* ¶¶ 59–65. "The Stock Sale took place more than a year after the IRS had published Notice 2001-16,"[28] and the Intermediary Transaction was not registered or reported by either Vance or the Shareholders. *Id.* ¶¶ 59, 87. As previously noted, Damato explained that the Stock Sale transaction was different because the sale amount was *very high* and the representations and warranties were *less extensive* than usual. *Id.* ¶ 62. The Shareholders also allegedly did not conduct in any due diligence into Diversified, Haber, or VCO. *Id.* ¶¶ 60–65. Fourth, the Government alleges the financial condition of the parties both before and after the transaction, including that as of April 5, 2002, "when it entered into the SPA, Vance was insolvent" and that "the Intermediary Transaction resulted in the [] Shareholders realizing an estimated federal tax savings of $12,904,973." *Id.* ¶¶ 88, 90.

Accordingly, even though only one is necessary to plead actual intent to defraud the Government, the Government sufficiently alleges: (1) that the [] Shareholders had

---

[28] The Defendants argue that the Government does not allege that the Defendants or their advisors "were aware of the [Notice 2001-16] or should have been aware of it" prior to the Stock Sale. Doc. 31 at 12 n.9. The Government responds that the Court "can draw the reasonable inference that (i) Kimberlee Phelan, a member of the Special Committee and certified public accountant and tax professional at the time of the Stock Sale . . . and (ii) the [] Shareholders' lawyers with tax expertise who advised them in connection with the Stock Sale . . . undoubtedly knew or should have known of IRS Notice 2001-16." Doc. 39 at 21 n.9 (citing Doc. 6 ¶¶ 39, 43, 65). Here, the Court can reasonably infer that "the [] Shareholders' agents knew or should have known of IRS Notice 2001-16, and been alerted to the fact that the Intermediary Transaction was an inappropriate [intermediary] transaction." *Id.*

motive and opportunity to commit the fraud; and (2) badges of fraud that give rise to a strong inference of fraudulent intent.

### 2.  Constructive Fraudulent Conveyance

 "To state a claim for constructive fraudulent conveyance under New York law, a plaintiff must plead that the transfer was made without fair consideration and that 'one of the following conditions is met:  (i) the transferor is insolvent or will be rendered insolvent by the transfer in question; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital; or (iii) the transferor believes that it will incur debt beyond its ability to pay.'" *In re Nine West LBO Securities Litigation*, 505 F. Supp. 3d 292, 319 (S.D.N.Y. 2020) (quoting *In re Sharp International Corp.*, 403 F.3d at 44).

"Fair consideration requires both (1) fair equivalency of the consideration and (2) good faith by both parties." *In re Eight-115 Associates., LLC*, 650 B.R. 43, 55 (Bankr. S.D.N.Y. 2023) (citing N.Y. DCL § 272).  "However, the plaintiff need only plead either a lack of fair equivalency or a lack of good faith on the part of the transferee to defeat a motion to dismiss." *Id.* (citing *In re Bernard L. Madoff Investment Securities LLC*, 458 B.R. 87, 110 (Bankr. S.D.N.Y. 2011)).  "Accordingly, a claim of constructive fraudulent conveyance is pleaded successfully if the [c]omplaint alleges sufficient facts to indicate that the [t]ransfers were made without fair consideration." *Id.*

"Constructive fraudulent conveyance claims arising under the DCL are subject to the standard pleading requirements of Federal Rule of Civil Procedure 8." *Nantong Sanhai Garment Co. v. Fab Mill Inc.*, No. 21-cv-859 (NRB), 2022 WL 540756, at *3 (S.D.N.Y. Feb. 23, 2022) (citing *Saadeh v. Kagan*, No. 20-cv-1945 (PAE) (SN), 2021 WL 5827942, at *4 (S.D.N.Y. Oct. 20, 2021)); *see In re Bernard L. Madoff*, 458 B.R. at 110.  "For such claims, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Id.* (internal quotation marks and citation omitted).

The Court finds that the Government alleges a constructive fraudulent conveyance claim because it alleges that the April 2002 transactions, when collapsed, constitute (1) a conveyance, (2) without fair consideration, (3) that rendered Vance insolvent. *See* NYUFCA § 273. Here, the Government alleges that, when considering the transactions as collapsed, Vance "sold its assets and made liquidating distributions to the [] Shareholders, which left Vance insolvent." Doc. 39 at 23; *see* Doc. 6 ¶¶ 77–83; *see Diebold*, 736 F.3d at 190. Vance "did not receive anything from the Shareholders in exchange" for the liquidating distributions, and "thus it is plain that [Vance] certainly did not receive fair consideration." *Diebold*, 736 F.3d at 190.

### 3. Liability Under New York's Trust Fund Doctrine

Under the trust fund doctrine, "officers and directors of an insolvent corporation are said to hold the remaining corporate assets in trust for the benefit of its general creditors." *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 549 (2000) (citations omitted). The doctrine "does not automatically create an actual lien or other equitable interest in corporate assets upon insolvency." *Id.* at 549–50 (citation omitted). "The application of the trust fund doctrine in New York customarily has been for the purpose of imposing liability on corporate directors or transferees for wrongful dissipation of assets of an insolvent corporation, in actions later brought by court-appointed receivers, trustees in bankruptcy[,] or judgment creditors." *MRI Enterprises, Inc. v. Hausknecht*, 38 N.Y.S.3d 220, 223 (2nd Dep't 2016) (citation omitted). "[A] simple contract creditor may not invoke the doctrine to reach transferred assets before exhausting legal remedies by obtaining judgment on the debt and having execution returned unsatisfied." *Credit Agricole*, 94 N.Y.2d at 550. The trust fund theory "envisions situations where a corporation attempts to divest itself of all or a substantial part of its property without affording an opportunity to its creditors to present and enforce their claims." *Roos v. Aloi*, 487 N.Y.S.2d 637, 641 (Sup. Ct. 1985) (citations omitted).

Defendants argue that the trust fund doctrine does not apply because the United States was not a creditor of Vance until the close of the taxable year, and there is "no authority that would establish [the Government] as a creditor of Vance when its assets were sold." Doc. 31 at 13–14. In response, the Government argues that "courts hold transferees retroactively liable for tax liabilities not yet assessed, or even unknown at the time of the transfer." Doc. 39 at 26 n.12. The Government further argues that "[u]nder New York's trust fund doctrine, the Government may recover a corporation's tax liability from former shareholders even if those taxes accrue or are assessed after the liquidating transactions at issue." *Id.* at 25.[29]

The Court finds that the Government sufficiently alleges a trust fund theory claim. As the Government points out, "[c]ourts impose liability under the [trust fund] doctrine against shareholders where (1) the corporation makes distributions of corporate assets to shareholders, (2) the corporation is thereby rendered insolvent, (3) the corporation owes a debt to a creditor (including taxes owed to the Government), and (4) exhaustion of remedies at law against the corporation would be futile to collect the debt." *Id.* at 24 (citing *United States v. Oscar Frommel & Brothers*, 50 F.2d 73, 74 (2d Cir. 1931)). Here, the Government alleges that the Shareholders are liable under the trust fund doctrine because (1) as of April 5, 2002, "when it entered into the SPA, Vance was insolvent"; (2) the Shareholders received over $65 million in liquidating distributions from Vance;[30] (3) "[t]he liquidating distributions received by the [] Shareholders were sufficient to satisfy the corporate income tax liability of Vance for tax year 2002"; (4) the

---

[29] In support of its argument, the Government also cites to *State v. Spectra Engineering, Architecture & Surveying P.C.,* 73 Misc.3d 1224(A) (N.Y. Sup. Ct. 2021), noting that the court found "unpersuasive defendant's argument that it is not liable under the trust fund theory because the State was not a creditor at the time of dissolution of the company." Doc. 39 at 25–26. However, as Defendants note, the court "dismissed the defendant's argument that the State was not a creditor at the time of the liquidating distributions only because the State had a contractual claim at the time of dissolution [and] [n]o similar contractual relationship is alleged here." Doc. 44 at 9 (emphasis omitted).

[30] The exact amount received from the Shareholders to Vance is unclear, but it is alleged to be at least $65 million. The complaint specifies both $66,100,000, Doc. 6 ¶¶ 71, 89, and $65,850,000, *id.* ¶¶ 81, 139.

Shareholders "made subsequent transfers of funds to the Subsequent Transferees, without fair consideration, and such funds should have been held in trust by the [] Shareholders and paid to the United States"; and (5) "exhaustion of the United States' remedies at law against Vance would be futile." Doc. 6 ¶¶ 81, 88, 102, 139, 141–42, 144. The United States is undoubtedly a creditor of Vance for the 2002 tax year, which was the same year as the liquidating distributions from Vance to the Shareholders. In addition, case law supports that the Government is allowed to recover a corporation's tax liability of a certain year under the trust fund doctrine from shareholders who received liquidating distributions that same year. *See Phillips-Jones Corp. v. Parmley*, 302 U.S. 233, 234–35 (1937) (under the trust fund doctrine, a shareholder can be liable for taxes owed for year when he received liquidating dividends); *see also Oscar Frommel*, 50 F.2d at 73–75 (shareholders liable for taxes owed for year when they received liquidating distributions).

### 4. Unjust Enrichment

"Unjust enrichment is a quasi-contract claim designed to prevent 'a person [from] enrich[ing] himself unjustly at the expense of another.'" *Liberty Mutual Insurance Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 273 (E.D.N.Y. 2012) (citation omitted); *see Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012). To state a claim for unjust enrichment under New York law, a plaintiff must provide proof that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004); *see Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 453 (S.D.N.Y. 2014). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381, 382 (4th Dep't 1999)). "The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff." *Town of Amherst v. Brewster Mews Housing*

*Co.*, 20 N.Y.S.3d 283, 285 (4th Dep't 2015) (citation omitted). To bring such a claim, the plaintiff must have bestowed the benefit on the defendant. *See Aymes v. Gateway Demolition Inc.*, 817 N.Y.S.2d 233, 234–35 (1st Dep't 2006) (citation omitted). It is not sufficient for defendant to receive some indirect benefit—the benefit received must be "specific and direct" to support an unjust enrichment claim. *Kaye*, 202 F.3d at 616. However, "it does not require a 'direct relationship between plaintiff and defendant,' nor does it 'matter whether the benefit [was] directly or indirectly conveyed.'" *Great Western Insurance Co. v. Graham*, No. 18-cv-6249 (VSB), 2020 WL 3415026, at *32 (S.D.N.Y. June 22, 2020) (citing *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018)). At the same time, "there must exist [some] relationship or connection between the parties that is not 'too attenuated.'" *Id.* (citing *Georgia Malone*, 19 N.Y.3d at 516).

Defendants argue that the Government has not properly pled an unjust enrichment claim because it has not shown that it provided a benefit to the Shareholders. Doc. 31 at 15. Defendants further argue that they "are unaware of any authority for a sovereign using an unjust enrichment claim to collect taxes." *Id.*

Here, the Government adequately alleges unjust enrichment by alleging that (1) the Shareholders "realiz[ed] an estimated federal tax savings of $12,904,973," (2) the Shareholders "were enriched at the expense of the [Government]" as a result of the Intermediary Transaction, and (3) "[e]quity and good conscience militate against permitting the [] Shareholders . . . to retain the funds necessary to pay the unpaid federal tax liability." Doc. 6 ¶¶ 90, 148–49. The alleged federal tax savings or the "benefit" received by the Shareholders is directly connected to the Government because "[t]he Intermediary Transaction was conceived … in an effort by the [] Shareholders to avoid those liabilities at the expense of the Government." Doc. 39 at 17. Thus, the relationship between the Shareholders and the Government is not "too attenuated." *See Great Western Insurance*, 2020 WL 3415026, at *32 (For an unjust enrichment claim, "the

relationship is 'too attenuated' if all that is alleged is that the defendant's 'mere knowledge' of the plaintiff, or if the parties 'simply had no dealings with each other.'") (citation omitted); *see also In re LIBOR-Based Financial Instruments Antitrust Litigation*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014). The Government also cites to *United States v. Deutsche Bank, A.G.*, No. 14-cv-9669 (LAK), 2015 WL 5697256 (S.D.N.Y. Sept. 24, 2015) to support its argument that "there is authority permitting the Government to collect taxes from transferees under an unjust enrichment theory." Doc. 39 at 28.[31]

### 5. *Money Had and Received*

Under New York law, an action for money had and received lies when: "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Aaron Ferrer & Sons Ltd. v. Chase Manhattan Bank, National Association*, 731 F.2d 112, 125 (2d Cir. 1984) (citation omitted); *see Amable v. New School*, 551 F. Supp. 3d 299, 319 (S.D.N.Y. 2021). In New York, the elements of a money had and received claim are "essentially identical to a claim of unjust enrichment." *Johnson v. JP Morgan Chase Bank, N.A.*, 488 F. Supp. 3d 144, 160 (S.D.N.Y. 2020). "A cause of action for money had and received 'is one of quasi-contract.'" *Amable*, 551 F. Supp. 3d at 319 (citation omitted). "Money had and received has been described as 'an obligation which the law creates in the absence of agreement when one party possesses money that in equity and good conscience [the party] ought not to retain and that belongs to another.'" *Id.* (citation omitted).

---

[31] In *Deutsch Bank*, the Government brought a claim for unjust enrichment under New York law against Deutsche Bank "to recover over $190 million in unpaid tax, penalties[,] and interest." 2015 WL 5697256 at *1. The Government alleged that Deutsch Bank "conducted a series of transactions with the purpose and effect of leaving a special purpose vehicle owing [tens] of millions of dollars of federal taxes that it was unable to pay while [Deutsch Bank] profited as a result of the non-payment of the taxes." *Id.*

Defendants argue that the Government misstates the standard for bringing a money had and received claim "by making the [] assertion that the funds retained by [the Shareholders] 'should have been paid to the United States.'"  Doc. 31 at 16.  Defendants further argue that the Government has not properly pled the claim because it has not pled that it has "some possessory interest in the specific [transfers]."  *Id.*  The Government argues that it sufficiently alleges the claim because it "clearly alleges that the [Shareholders] received and continue to benefit from funds that belong to [it]."  Doc. 39 at 29.

Here, the Government sufficiently alleges a money had and received claim because it alleges that the Shareholders (1) "received and retained funds that should have been paid to the United States to satisfy the unpaid federal tax liability of Vance," (2) "benefited, and continue to benefit, from the receipt of funds that should have been paid to the United States," and (3) "[e]quity and good conscience militate against permitting the [] Shareholders . . . to retain the funds necessary to pay the unpaid federal tax liability of Vance."  Doc. 6 ¶¶ 152–54.  Defendants' argument that the Government "must have had some possessory interest in the specific funds" is unpersuasive because "[a]n action for money had and received is in its nature a substitute for a suit in equity; it is to be ruled by broad considerations of equity and justice, and it aims at the abstract justice of the case, unfettered by technical rules."  *Tzfira v. Kadouri International Foods, Inc.*, No. 07-cv-671 (LAP), 2009 WL 10695620, at *2 (S.D.N.Y. June 23, 2009), *aff'd*, 365 F. App'x 235 (2d Cir. 2010) (citation omitted).  In addition, the cases cited by Defendants to support its arguments—*In re Ames Dept. Stores, Inc., Bankruptcy*, No. 01-42217 (REG), 2006 WL 2400107 (Bankr. S.D.N.Y. 2006) and *Mia Shoes, Inc. v. Republic Factors Corp.*, No. 96-cv-7974 (TPG), 1997 WL 525401 (S.D.N.Y. 1997)—are distinguishable, as noted by the Government, because "they involve situations 'where a contract existed between two parties to collect funds,'" which is not the case here.  Doc. 39 at 29 n.14.

31

### B. Claims Against the Subsequent Transferees

#### 1. Actual and Constructive Fraudulent Conveyance

Defendants argue that for the actual and constructive fraudulent conveyance claims, the complaint does not address "the [S]ubsequent [T]ransferees' liability, beyond simply concluding that they are liable," and that the "[c]omplaint does not identify specific subsequent transfers at all." Doc. 31 at 15 (emphasis omitted). Here, the Government specifically alleges that the Shareholders made subsequent transfers, including through the various trusts which held a percentage of Vance's stock. *See* Doc. 6 ¶¶ 9 & n.3, 10 & ns. 4 & 5, 12, 14, 16, 18–23. If the Government prevails on its actual and constructive fraudulent conveyance claims, the Government may "seek to recover the fraudulently transferred property … because . . . these subsequent transferees were not 'purchaser[s] for fair consideration.'" Doc. 39 at 30 (quoting NYUFCA § 278). Accordingly, the Government has sufficiently alleged actual and constructive fraudulent conveyance as to the Subsequent Transferees.

#### 2. New York Trust Fund Doctrine, Unjust Enrichment, and Money Had and Received

Defendants argue that the Complaint "does not explain why the [Shareholders] should have been holding funds in trust . . . or how the subsequent transferees were unjustly enriched." Doc. 31 at 17. The Government argues that for the causes of action under the trust fund doctrine, for unjust enrichment, and for money had and received, "there is no requirement that the Subsequent Transferees have any 'knowledge of or involvement with' the Intermediary Transaction." Doc. 39 at 30. Here, all of the alleged distributions to the Subsequent Transferees "were gratuitous transfers—*i.e.*, trust distributions or estate distributions—made without any consideration at all." *Id.* In addition, these equitable theories under New York law "do[] not require the performance of any wrongful act by the one enriched." *Simonds v. Simonds*, 45 N.Y.2d 233, 242 (1978).

The Government also argues that "it is axiomatic that '[a] bona fide purchaser of property upon which a constructive trust would otherwise be imposed takes free of the constructive trust, but a gratuitous donee, however innocent, does not.'"  Doc. 39 at 30 (quoting *Simonds*, 45 N.Y.2d at 242).  In response, Defendants argue that the Government "has not [] attempted to establish its entitlement to [a constructive trust]."  Doc. 44 at 12.

"Under New York law, a party claiming entitlement to a constructive trust must ordinarily establish four elements:  (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment."  *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352 (2d Cir. 1992), *aff'd in part sub nom. Refco F/X Assocs., Inc. v. Mebco Bank, S.A.*, No. 89-cv-3071 (WK), 1992 WL 200748 (S.D.N.Y. July 31, 1992) (citations omitted).  "The remedy of constructive trust is a flexible one, and New York courts do not require that the facts always fit within the framework of these four elements."  *In re Barbieri*, 380 B.R. 284, 296 (Bankr. E.D.N.Y. 2007) (citing *Counihan v. Allstate Insurance Co.*, 194 F.3d 357, 362 (2nd Cir.1999)).  "[C]ourts recognize the 'key factor' for the establishment of a constructive trust to be unjust enrichment."  *BNP Paribas Mortgage Corp. v. Bank of America, N.A.*, 949 F. Supp. 2d 486, 515 (S.D.N.Y. 2013) (citations omitted).  "Unjust enrichment results when a person retains a benefit which, under the circumstances of the transfer and considering the relationship of the parties, it would be inequitable to retain."  *In re First Central Financial Corp.*, 269 B.R. 481, 500 (Bankr. E.D.N.Y. 2001), *subsequently aff'd*, 377 F.3d 209 (2d Cir. 2004) (citing *Counihan* 194 F.3d at 361).

The Court finds that the alleged facts warrant the imposition of a constructive trust as to the Subsequent Transferees.  Thus, because the Court has already determined that the Government sufficiently alleges trust fund doctrine, unjust enrichment, and money had and received claims as to the Shareholders, that analysis is likewise applicable

here.  Accordingly, the Government has sufficiently alleged trust fund doctrine, unjust enrichment, and money had and received claims as to the Subsequent Transferees.

**IV.     CONCLUSION**

For the reasons set forth above, the motion to dismiss is DENIED.  The parties are directed to appear for a conference on October 2, 2025 at 2:30 p.m. in Courtroom 619 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, NY 10007.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 30.

It is SO ORDERED.

Dated:     September 11, 2025
       New York, New York

 

_____
EDGARDO RAMOS, U.S.D.J.